James M. GIBSON, Plaintiff-Respondent,

v.

OVERNITE TRANSPORTATION COMPANY, Defendant-Appellant.†

Court of Appeals

*No. 02–3158. Submitted on briefs August 5, 2003.—Decided September 23, 2003.*

2003 WI App 210

(Also reported in 671 N.W.2d 388.)

† Petition to review dismissed 1-29-04.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Craig A. Kubiak* of *Godrey & Kahn, S.C.*, Appleton.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Carey J. Reed* of *Law Office of Carey J. Reed*, Appleton.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. PETERSON, J. Overnite Transportation Company appeals a judgment for money damages based upon a jury verdict finding defamation based on negative comments a manager made about former employee James Gibson. Overnite was ordered to pay a total of $283,000 in compensatory and punitive damages. Overnite argues: (1) The defamation action is preempted by

the National Labor Relations Act; (2) Gibson did not prove the requisite malice to show Overnite abused its conditional privilege as an employer to make statements about a former employee; (3) the punitive damages are excessive; and (4) the trial court erred by not requiring the jury to find that the damages were caused by the defamation. We disagree with all four arguments and affirm the judgment and order.

## BACKGROUND

¶ 2. Overnite is a nationwide trucking company. Gibson worked for Overnite out of the Kaukauna terminal, a nonunion facility. Gibson began working for Overnite in May 1999, first on the dock and eventually as a truck driver. In October 1999, the Teamsters went on strike and established a picket line at Overnite's Milwaukee terminal, a union facility. Due to the strike, the Milwaukee terminal was essentially shut down. Overnite therefore ran some of the Milwaukee freight through Kaukauna. Because Gibson had previously worked in Milwaukee and was familiar with the area, he was temporarily assigned to pick up freight at the Milwaukee facility. When he was there, Teamster supporters harassed him.

¶ 3. Gibson decided to resign from Overnite. Gibson told Tim Behling, the terminal manager in Kaukauna, that he had to quit immediately to help his ailing grandfather's company. In fact, Gibson went to work for another trucking company, USF Holland, the next day. Gibson testified at trial that he lied because he was afraid Behling would retaliate against him for quitting to avoid confrontations with the Teamsters in Milwaukee and for going to work for a union company.

¶ 4. Gibson started at USF Holland as a probationary employee. In January 2000, USF Holland hired

433

Robert Arden and Associates to check Gibson's background. An Arden representative called Behling for an employment reference. The report Arden generated indicated that Behling made the following comments regarding Gibson: "He was way below average. He needed to improve his work ethic and attitude." "He was late most of [the] time and he missed anywhere from two to three days a week." "He had a real problem with authority." "He has a very negative attitude." "He's everybody[']s best friend – so he thinks. He did get along with some people, but most saw through him." "His paperwork was fair. It needed help like you wouldn't believe." Behling also indicated that Gibson's trustworthiness was "borderline," and that he would "never" rehire Gibson. Overnite was the only one of Gibson's former employers to give a negative report to Arden. Based on the report, USF Holland terminated Gibson's employment.

¶ 5. Gibson commenced this action against both Overnite and Behling, asserting blacklisting and common law defamation. Gibson later dismissed the blacklisting claim as well as claims against Behling. A jury trial was held. Gibson testified that he was embarrassed, humiliated and that his reputation was harmed by Behling's statements. He stated that people in the trucking industry were aware of the information in Arden's report. Gibson commented that, due to Behling's negative comments, he was unable to find another job for a year and a half after he left USF Holland. He also testified about the loss of income he suffered as a result.

¶ 6. The jury found that Behling's statements were defamatory and made with express, but not actual, malice. It awarded Gibson $33,000 in compensatory damages and $250,000 in punitive damages. Over-

nite filed motions after the verdict arguing, among other things: (1) Gibson's claim was preempted by the National Labor Relations Act because Behling's statements were part of a "labor dispute;" (2) actual malice, not express malice, was required to overcome Overnite's conditional privilege as an employer; (3) the punitive damages were excessive; and (4) the jury should have been required to find that Behling's statement caused the damages to Gibson. The court rejected Overnite's motions and entered judgment on the jury's verdict. Overnite appeals.

## DISCUSSION

### A. National Labor Relations Act

■

¶ 7. Overnite first claims that Gibson's defamation action is preempted by the National Labor Relations Act. Overnite argues that even though Gibson characterized the claim as defamation, it actually amounts to blacklisting, which is arguably an unfair labor practice under § 8 of the Act. Because state law claims are preempted when they arguably are subject to § 8, Overnite maintains that the National Labor Relations Board has exclusive jurisdiction over the action.[1]

¶ 8. However, Overnite did not argue during motions after the verdict that blacklisting was the basis of the preemption. Instead, it argued that the statements were made in the context of a labor dispute and the action should be preempted on that basis. Overnite

---

[1] When an activity is arguably subject to § 8 of the National Labor Relations Act, state and federal courts must defer to the National Labor Relations Board in order to avoid the danger of state interference with national policies. *See San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 245 (1959).

noted that Gibson testified that he lied to Behling about his reason for leaving because Gibson believed Behling was anti-union. Gibson also stated he was afraid he would be punished for leaving Overnite to work for a union company. This, Overnite claimed, showed that Behling's statements were made in the context of a labor dispute. The trial court determined, however, that Behling's statements did not take place in the context of a labor dispute and therefore the claim was not preempted by the Act.

¶ 9. Generally, we will not consider on appeal arguments not made to the trial court. *Hopper v. Madison*, 79 Wis. 2d 120, 137, 256 N.W.2d 139 (1977). Although new arguments may be permitted on an issue that was properly raised in the trial court, *see State v. Holland Plastics, Co.*, 111 Wis. 2d 497, 505–06, 331 N.W.2d 320 (1983), "we will not . . . blindside trial courts with reversals based on theories which did not originate in their forum." *State v. Rogers*, 196 Wis. 2d 817, 827, 539 N.W.2d 897 (Ct. App. 1995).

¶ 10. There was a three-day jury trial in this case involving many resources, as well as motions after the verdict. Overnite had ample opportunity to make an argument regarding blacklisting, but did not do so. We have reviewed the record, and nowhere do we find any argument by Overnite that the action should be preempted because Behling's statements amounted to blacklisting. In its motions after the verdict, Overnite framed the issue as whether there was a labor dispute, and the trial court ruled on that issue only. Blacklisting is a different issue altogether. Under these circumstances, we will not overturn the verdict based on an argument that the trial court was never given an opportunity to address.

436

## B. Employer's Conditional Privilege Under Wis. Stat. § 895.487

■

¶ 11. An employer has a conditional privilege under Wis. Stat. § 895.487 to make statements about a former employee. Overnite argues that, to abuse the privilege, statements must be made with actual malice, that is, with knowledge of falsity or with reckless disregard for the truth. *Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 528, 563 N.W.2d 472 (1997). Express malice, however, requires only a showing of ill will, bad intent, envy, spite, hatred, revenge, or other bad motives against the person defamed. *Polzin v. Helmbrecht*, 54 Wis. 2d 578, 587–88, 196 N.W.2d 685 (1972). Because the jury found express malice, and not actual malice, Overnite contends it cannot ·be held liable.

■

¶ 12. The interpretation of a statute and its application to a set of facts are questions of law we review independently. *Reyes v. Greatway Ins. Co.*, 227 Wis. 2d 357, 364–65, 597 N.W.2d 687 (1999). "The purpose of statutory interpretation is to discern the intent of the legislature," and we look to the plain language of the statute to determine intent. *Id.* at 365. Only if the statutory language renders legislative intent ambiguous do we resort to judicial construction. *Id.*

¶ 13. Wisconsin Stat. § 895.487(2)[2] states:

> An employer who, on the request of an employee or a prospective employer of the employee, provides a reference to that prospective employer is presumed to be

---

[2] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

acting in good faith and, unless lack of good faith is shown by clear and convincing evidence, is immune from all civil liability that may result from providing that reference. The presumption of good faith under this subsection may be rebutted only upon a showing by clear and convincing evidence that the employer knowingly provided false information in the reference, *that the employer made the reference maliciously* or that the employer made the reference in violation of s. 111.322. (Emphasis added.)

The statute is silent as to whether actual or express malice is required.

¶ 14. Both Overnite and Gibson point to a memo from the Wisconsin Legislative Reference Bureau to the sponsor of the bill that became WIS. STAT. § 895.487. At the time the statute was enacted, the common law simply required express malice to rebut the conditional privilege. *See Calero v. Del Chem. Corp.*, 68 Wis. 2d 487, 507, 228 N.W.2d 737 (1975) ("The proper test to apply to determine whether the nonconstitutional conditional privilege was abused is a question of express malice. This is what is termed 'common law malice,' by the United States Supreme Court." (Citation omitted.)). The Legislative Reference Bureau encouraged the legislature to specifically require express malice in the statute as well in order to clarify the standard. However, the legislature made no change.

¶ 15. Overnite interprets the legislature's failure to make the suggested change to mean it intended the standard to be actual malice. Gibson's interpretation is that the legislature intended to retain the common law standard of express malice. We agree with Gibson.

¶ 16. WISCONSIN STAT. § 895.487(2) provides three ways in which the presumption of good faith may be

rebutted: (1) "the employer knowingly provided false information in the reference," (2) "the employer made the reference maliciously," or (3) "the employer made the reference in violation of s. 111.322." The first option could arguably require actual malice because it requires that the employer act "knowingly." However, there remain two other options. The second option simply requires malice. The legislature was alerted to the ambiguity of the word "maliciously" but did not make any change. Common law prevails in Wisconsin until changed by statute. *Aaby v. Citizens Nat'l Bank*, 197 Wis. 56, 57, 221 N.W. 417 (1928). To abrogate the common law, the intent of the legislature must be clearly expressed, either in specific language or in a manner that leaves no reasonable doubt of the legislature's purpose. *Sullivan v. School Dist. No. 1 Tomah*, 179 Wis. 502, 506, 191 N.W. 1020 (1923). We therefore conclude that the legislature intended to keep the same standard of malice as existed in the common law–express malice.

¶ 17. Our conclusion is further supported by the jury instructions. *See State v. Olson*, 175 Wis. 2d 628, 642 n.10, 498 N.W.2d 661 (1993) ("[W]hile jury instructions are not precedential, they are of persuasive authority."). Like Wis. Stat. § 895.487(2), Wis JI—Civil 2507 lists ways in which the jury can find that an employer abused its privilege to make statements about former employees. First, the jury may find that the defendant made the statements knowing that they were false or in reckless disregard as to the truth or falsity of them. This is actual malice. However, the jury may also find defamation where the defendant made statements solely from spite or ill will. This is express malice, which is what the jury found here. Actual malice is not required.

## C. Punitive Damages

¶ 18. Next, Overnite contends that the punitive damages are excessive. Punitive damages may properly be imposed to further a state's legitimate interest in punishing unlawful conduct and deterring its repetition. *BMW of N. Am., Inc. v Gore*, 517 U.S. 559, 568 (1996). In Wisconsin, the award of punitive damages is within the discretion of the jury, and "We are reluctant to set aside an award merely because it is large or we would have awarded less." *Jacque v. Steenberg Homes, Inc.*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997).

¶ 19. Although we review an award of damages independently, the Due Process Clause of the Fourteenth Amendment imposes substantive limits on the size of a punitive damages award. *Management Computer Servs. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 193, 557 N.W.2d 67 (1996).

¶ 20. In determining whether a punitive damage award is excessive, we consider, from the following factors, those most relevant to the case: (1) the grievousness of the acts; (2) the degree of malicious intent; (3) whether the award bears a reasonable relationship to the award of compensatory damages; (4) the potential damage that might have been caused by the acts; (5) the ratio of the award to civil or criminal penalties that could be imposed for comparable misconduct; and (6) the wealth of the wrongdoer. *Id.* at 194.

¶ 21. Here, the relevant factors are the first, second, third, and sixth. The first two factors are the grievousness of the acts and the degree of malicious intent. Over the course of three days, the jury heard

evidence regarding the statements Behling allegedly made as well as testimony that contradicts Behling's statements. For example, Arden's report noted that Behling commented that Gibson's paperwork "needed help like you wouldn't believe." However, Gibson's employment file for Overnite showed no incidents of Gibson ever being reprimanded for poor paperwork. Behling also commented that Gibson was a below average employee. However, none of Gibson's previous employers had any negative comments about Gibson's performance.

¶ 22. Gibson's manager at USF Holland testified that Gibson would not have been fired absent Behling's reference. After leaving USF Holland, Gibson interviewed with some companies but was unable to secure a job for a year and a half. Behling gave employment references to many of the places Gibson interviewed but was not hired. From this and other evidence, the jury concluded that Behling's actions were grievous and constituted express malice toward Gibson.

¶ 23. The next factor is whether the award bears a reasonable relationship to the compensatory damages award. Our supreme court's recent decision in *Trinity Ev. Church v. Tower Ins. Co.*, 2003 WI 46, 261 Wis. 2d 333, 661 N.W.2d 789, is instructive. There, the court approved punitive damages seven times greater than the compensatory damages. *See id.*, ¶ 69. The punitive damages here are approximately eight times greater than the compensatory damages ($250,000 and $33,000, respectively). We do not consider this to be significantly greater than the award upheld in *Trinity*.[3]

---

[3] Though not cited by the parties, we acknowledge the United States Supreme Court's decision in *State Farm Mut. Auto Ins. Co. v. Campbell*, 123 S.Ct. 1513 (2003). There, the

¶ 24. As a final factor, we consider Overnite's wealth. Wealth of the wrongdoer is an appropriate factor in determining the amount of punitive damages to award. *Fahrenberg v. Tengel*, 96 Wis. 2d 211, 234, 291 N.W.2d 516 (1980). The parties stipulated that Overnite's wealth amounted to $315,013,578. The jury was properly instructed that it should award an amount in punitive damages that would serve to punish Overnite for its conduct and deter it from acting similarly in the future. The jury awarded $250,000. This amount is not shocking given the evidence and Overnite's wealth. In light of our discussion of the relevant factors, we conclude the punitive damages are not excessive.

## D. Causation

¶ 25. Finally, Overnite argues that the court erroneously failed to require the jury to find that Behling's statements caused Gibson's damages. However, Overnite cites to nothing in the record to indicate that it objected to the court's instructions. Furthermore, the court did instruct the jury that the damage award must reflect "the amount of actual financial loss suffered by Mr. Gibson as *caused by the defamatory statements.*" (Emphasis added.) Additionally, the court instructed: "Before you may find that Mr. Gibson suffered losses as a result of the defamatory employer

---

Court determined that an award of $1 million in compensatory damages and $145 million in punitive damages violated due process. *Id.* at 1519. However, in *Campbell*, the compensatory damages for emotional distress already contained a punitive element, rendering an additional punitive award unnecessary. *Id.* at 1516–1517. Here, $22,000 of the $33,000 awarded for compensatory damages was for financial damages. As a result, the compensatory damage award had little, if any, punitive element.

reference, you must be satisfied that the defamatory statements *are a substantial factor* in producing that loss." (Emphasis added.) Consequently, the record shows the jury was instructed that it had to find that the damages were caused by the defamation.

*By the Court.*—Judgment and order affirmed.