STATE of Wisconsin,
Plaintiff-Respondent,

v.

Todd W. BERGGREN,
Defendant-Appellant.†

Court of Appeals

*No. 2008AP786–CR. Submitted on briefs February 5, 2009.*
*—Decided May 27, 2009.*

2009 WI App 82

(Also reported in 769 N.W.2d 110.)

† Petition to review denied 8/17/09.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Robert G. LeBell* of *LeBell, Dobroski & Morgan LLP*, of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general, and *Sarah K. Larson*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Todd W. Berggren appeals from a judgment of conviction, entered upon his guilty pleas, for two counts of first-degree sexual assault of a child, two counts of second-degree sexual assault of an unconscious victim, two counts of sexual exploitation of a child, and one count of possession of child pornography, contrary to WIS. STAT. §§ 948.02(1), 940.225(2)(d), 948.05(1)(b), and 948.12 (2005–06).[1] Berggren also appeals the orders denying his motions for postconviction relief. He argues that he should be able to withdraw his pleas, contending that his trial counsel was ineffective because he failed to file suppression motions relating to: (1) the seizure of a memory stick containing incriminating photographs; and (2) Berggren's custodial statements. He further asserts that the trial court erroneously exercised its discretion when it sentenced him and that the sentence imposed is excessive and constitutes cruel and unusual punishment. We conclude that Berggren's trial counsel was not ineffective and that the trial court properly exercised its discretion and imposed a sentence that was not unduly harsh. Accordingly, we affirm the judgment and orders.

[1] In his appellate briefs, Berggren contends that he was found guilty pursuant to a no-contest plea. The record, however, reveals that Berggren pled guilty to the charges referenced.

All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

## I. BACKGROUND.

¶ 2. On November 28, 2005, Berggren was charged with two counts of first-degree sexual assault of a child, two counts of second-degree sexual assault of an unconscious victim, two counts of sexual exploitation of a child, and thirteen counts of possession of child pornography. The charges brought against Berggren stem from his then-twelve-year-old daughter's, Brittany B.'s, November 23, 2005 discovery of photographs on a memory stick for Berggren's digital camera.[2] Brittany inserted the memory stick into Berggren's digital camera to look for photographs of a recent soccer team outing. Instead, she discovered photographs she described as "nasty." Those "nasty" photographs depicted a young female performing an oral sex act on an unidentified male. Brittany later identified the male as Berggren and the young female as her step-sister, Cynthia R., who was also twelve years old at the time.

¶ 3. The same day that Brittany discovered the photographs, Lisa R., Brittany's mother, was contacted by Dawn R., Cynthia's mother. Dawn informed Lisa that Cynthia had had a conversation with Brittany the previous evening, November 22, 2005, in which Brittany told Cynthia that she was afraid that Berggren had

---

[2] Due to the sensitive nature of the crimes involved, we refer to certain individuals by first name and last initial only. Brittany is Berggren's daughter. Berggren and Brittany's mother, Lisa R., shared custody of her. At some point, Berggren began a relationship with Dawn R., who was divorced. Dawn and Robert R. had three children, including Cynthia R. Dawn and her children resided with Berggren for a period of time. Lisa R. eventually met and married Robert R.

touched Brittany inappropriately.[3] Upon learning this, Lisa called Brittany, who was at Berggren's residence, and attempted to speak with her regarding the information relayed by Dawn. Brittany was not talkative, which Lisa believed was due to Berggren's presence within listening distance. After that, to get Brittany out of Berggren's house, Lisa called Berggren and told him, falsely, that her aunt was ill and that Brittany needed to join her family at the hospital.

¶ 4. Lisa then asked her brother, Michael Bolender, and her father to pick Brittany up from Berggren's residence. At the time, Bolender was a lieutenant with the Oak Creek Police Department. On the evening of November 23, 2005, he was off-duty and on vacation due to the Thanksgiving holiday. Bolender and Lisa's father picked Brittany up from Berggren's residence and returned to Lisa's home. Before leaving Berggren's residence, Brittany, of her own volition, took the memory stick that contained the "nasty" photographs.

¶ 5. After arriving home, Brittany shared with Lisa, outside the presence of Bolender, that Brittany had observed "pictures of Daddy naked with Cindy." Lisa then gave the memory stick to Bolender and instructed Brittany to explain what it was. Brittany told him that it contained "gross" or "nasty" pictures and may have also said that the pictures were "of her Dad." After he was unsuccessful in his attempt to access the memory stick on Lisa's computer, Bolender took the memory stick to his parents' residence to use with their computer. At his parents' residence, Bolender viewed two photographs, both of which contained similar pic-

---

[3] Allegations that Berggren inappropriately touched Brittany are not at issue in this case.

219

tures of a male torso from the chest down, and Cynthia lying next to the male torso having penis-to-mouth oral sex. Cynthia appeared to be asleep or unconscious in the photographs. Bolender contacted the Oak Creek Police Department, and Berggren was subsequently arrested.

¶ 6. Berggren pled guilty to two counts of first-degree sexual assault of a child, two counts of second-degree sexual assault of an unconscious victim, two counts of sexual exploitation of a child, and one count of child pornography. Pursuant to plea negotiations, the twelve remaining counts of possession of child pornography were dismissed but read-in at sentencing.[4] He was sentenced as follows: Count 1 (first-degree sexual assault of a child), eighteen years of initial confinement and five years of extended supervision; Count 2 (first-degree sexual assault of a child), eighteen years of initial confinement and five years of extended supervision, concurrent to Count 1; Count 3 (second-degree sexual assault of an unconscious victim), twelve years of initial confinement and six years of extended supervision, consecutive to Counts 1 and 2; Count 4 (second-degree sexual assault of an unconscious victim), twelve years of initial confinement and six years of extended supervision, concurrent to Count 3; Count 5 (sexual exploitation of a child), five years of initial confinement and five years of extended supervision, consecutive to Counts 3 and 4; Count 6 (sexual exploitation of a child), five years of initial confinement and five years of extended supervision, concurrent to Count 5; and Count 7 (possession of child pornography), one year of initial confinement and one year of extended supervi-

_____

[4] *See State v. Straszkowski*, 2008 WI 65, ¶ 93, 310 Wis. 2d 259, 750 N.W.2d 835 (discussing effect of "read-in charges").

sion, consecutive to Counts 5 and 6. In total, Berggren was sentenced to thirty-six years of initial confinement and seventeen years of extended supervision.

¶ 7. Berggren filed a postconviction motion seeking sentence modification on the basis that the sentence imposed was the product of an erroneous exercise of discretion. The trial court denied Berggren's motion and he appealed, but later voluntarily dismissed his appeal to pursue a second postconviction motion.

¶ 8. In his second postconviction motion, Berggren sought to withdraw his pleas based on ineffective assistance of counsel. Berggren maintained that his trial counsel was ineffective because he failed to file suppression motions related to the memory stick and statements Berggren made while in custody. The trial court held a *Machner* hearing, after which it denied Berggren's motion to vacate his pleas, adopting the State's findings of facts and conclusions of law *in toto*.[5] Berggren now appeals. Additional facts will be provided in the analysis section as necessary to the discussion of Berggren's claims.

## II. ANALYSIS.

### A. Berggren's *trial counsel did not render ineffective assistance.*

¶ 9. Berggren argues that he should be able to withdraw his pleas because his trial counsel was ineffective for failing to challenge the seizure of a memory stick containing incriminating photographs and for not filing a motion to suppress his custodial statements. In

---

[5] A *Machner* hearing is an evidentiary hearing to determine trial counsel's effectiveness. *See State v. Machner*, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

221

an affidavit, Berggren asserts that if he had known "that there was a viable motion to suppress the memory stick and/or the custodial statements, he would not have ple[]d guilty."

¶ 10. "Following sentencing, a defendant who seeks to withdraw a guilty or *nolo contendere* plea carries the heavy burden of establishing, by clear and convincing evidence, that the trial court should permit the defendant to withdraw the plea to correct a 'manifest injustice.' " *State v. Washington*, 176 Wis. 2d 205, 213, 500 N.W.2d 331 (Ct. App. 1993) (citation omitted). Ineffective assistance of counsel can constitute a "manifest injustice." *Id.* at 213–14.

¶ 11. A defendant claiming ineffective assistance of counsel must establish that the trial counsel's performance was deficient, and that the defendant suffered prejudice as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The court need not address both components of the analysis if the defendant makes an inadequate showing on one. *Id.* at 697. To prove deficient performance, a defendant must establish that trial counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Thus, the defendant must overcome a strong presumption that trial counsel acted reasonably within professional norms. *Id.* at 689.

¶ 12. We review a claim for ineffective assistance of counsel under a mixed standard of review. *State v. Johnson*, 153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). The trial court's findings of fact will not be overturned

unless clearly erroneous. *Id.* However, determinations as to whether counsel's performance was deficient and prejudicial are questions of law which we review independently. *Id.* at 128. We consider Berggren's claims of ineffective assistance of counsel in turn.

1. Alleged ineffective assistance in connection with trial counsel's failure to file a suppression motion related to the memory stick.

██

¶ 13. Berggren's first claim on appeal is that his attorney should have sought to suppress the memory stick and the photographs it contained. Berggren contends that "the viewing [of the memory stick's contents] by Bolender and the subsequent viewing by Oak Creek police officers constituted a warrantless search, subject to the exclusionary rule."[6] Our resolution of this issue centers on whether Bolender was acting in a private capacity or as an investigating officer when he seized the memory stick and viewed its contents. Berggren contends that Bolender was acting in his official investigative capacity as a law enforcement officer when he viewed the contents of the memory stick because "[t]he circumstances which unfolded on that evening on November 23, 2005, would have led a reasonable law enforcement officer to believe that there was evidence of a crime, contraband, or some other potential incriminating contents in the memory stick." We disagree.

¶ 14. "Private searches are not subject to the Fourth Amendment's protections because the Fourth

---

[6] Berggren concedes that Brittany's actions in obtaining the memory stick and giving it to her mother and Bolender constituted a search that was not covered by the Fourth Amendment.

Amendment applies only to government action." *State v. Payano-Roman*, 2006 WI 47, ¶ 17, 290 Wis. 2d 380, 714 N.W.2d 548. We independently determine whether a search is private or governmental in nature by considering the totality of the circumstances. *Id.*, ¶¶ 21, 24. Before a search will be deemed private, three requirements must be met: " '(1) the police may not initiate, encourage or participate in the private entity's search; (2) the private entity must engage in the activity to further its own ends or purpose; and (3) the private entity must not conduct the search for the purpose of assisting governmental efforts.' " *Id.*, ¶ 18 (citation omitted). The defendant has the burden to prove by a "preponderance of the evidence" that the search was governmental. *Id.*, ¶ 23.

¶ 15. In *State v. Cole*, 2008 WI App 178, 315 Wis. 2d 75, 762 N.W.2d 711, we had the opportunity to address when an off-duty law enforcement officer acts in a private capacity rather than as a government agent for purposes of the Fourth Amendment. After considering case law from other jurisdictions, we explained:

> there appears to be general agreement in other jurisdictions that have considered the issue that "[government] involvement [in a search] is not measured by the primary occupation of the actor, but by the Capacity [sic] in which he acts at the time in question"; therefore, an off-duty officer acting in a private capacity in making a search does not implicate the Fourth Amendment.

*Id.*, ¶ 13 (citations omitted; alterations in *Cole*). We went on to express our agreement with this conclusion. *Id.*; *see also State v. Rogers*, 148 Wis. 2d 243, 246, 435 N.W.2d 275 (Ct. App. 1988) ("The mere fact that government agents were present at the time of the search does not make it a governmental search.").

224

¶ 16. Based on the findings of fact adopted by the trial court, when Bolender was given the memory stick, he was off-duty and went to Lisa's home after receiving a call that she was upset about something having to do with his niece, Brittany. Bolender came into the situation being "on Todd[ Berggren]'s side," as Berggren was someone he knew and trusted. Bolender "thought that this was probably a situation where something had been blown out of proportion." He "never thought that the memory stick might contain the kind of pictures he observed" and "[h]e never thought that the pictures would contain evidence of a crime." Bolender first tried to view the pictures on Lisa's computer, which was in an open area of the house such that, if the memory stick had worked with Lisa's computer, everyone present, including Cynthia and other children, would have been able to view the pictures.

¶ 17. We conclude that the viewing of the photographs by Bolender did not meet the requirements under *Payano-Roman* for a government search. First, despite the fact that Bolender was a lieutenant for the Oak Creek Police Department, his actions were not instigated by the police. Second, his actions were taken in his capacity as Brittany's uncle; he acted in the interest of his family when he viewed the photographs that Brittany described as "nasty." Finally, nothing in the record suggests that Bolender acted " 'for the purpose of assisting governmental efforts.' " *See Payano-Roman*, 290 Wis. 2d 380, ¶ 18 (citation omitted).

¶ 18. According to Berggren, "[t]here is no other reasonable explanation, under the circumstances described herein, other than that Bolender was acting in his official investigative capacity as a law enforcement officer." We disagree based on our deferential review of the trial court's factual findings. *See id.*, ¶ 16. Berggren

specifically contends that "testimony of Bolender that he was not concerned that the media stick might contain contraband or evidence was not credible, in light of the facts which existed at the time the media stick was given to him." Credibility determinations, however, are for the trial court. *See State v. Baudhuin*, 141 Wis. 2d 642, 647, 416 N.W.2d 60 (1987) ("The credibility of witnesses and weight to be given their testimony are matters for the trial court to decide."). Here, the trial court found that both Bolender and Lisa were credible witnesses. We defer to the trial court unless the underlying testimony was incredible as a matter of law. *See Hallin v. Hallin*, 228 Wis. 2d 250, 258–59, 596 N.W.2d 818 (Ct. App. 1999). Although Berggren references various omissions from the trial court's factual findings, the lack of such findings does not render the testimony somehow incredible.[7] Moreover, when the record does not include a specific finding on an issue, this court will assume that the issue was resolved by the trial court in a manner which supports the final judgment or order. *See Sohns v. Jensen*, 11 Wis. 2d 449, 453, 105 N.W.2d 818 (1960).

¶ 19. Berggren next contends that he had a clear expectation of privacy in the contents of the memory stick. Because we concluded that Bolender was acting in a private capacity and not in an official capacity when

_____

[7] Berggren argues that the trial court's findings "did not include a finding that no one told Michael Bolender about the contents of the memory stick." In addition, Berggren asserts: "the findings fail to address Bolender's acknowledgement that he was always on duty and had special training regarding the discovery of contraband." Lastly, he contends, "the court failed to adopt the testimony of Bolender that he would not have viewed the contents of the memory stick if he wasn't concerned about what was on it."

he viewed photographs on the memory stick, Berggren's privacy expectations only become relevant insofar as they relate to the subsequent viewing of the photographs by the Oak Creek police officers. *See United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (explaining the Fourth Amendment's protection "as proscribing only governmental action; it is wholly inapplicable 'to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official' ") (citation omitted).

¶ 20. After an initial invasion of privacy by private action, "additional invasions of . . . privacy by the government agent must be tested by the degree to which they exceeded the scope of the private search." *Id.* at 115. Following the viewing of the photographs through the private actions of Brittany and Bolender, Berggren no longer had an expectation of privacy subject to Fourth Amendment protections. The subsequent viewing by Oak Creek police officers was not an additional search subject to the warrant requirement as it did not exceed the scope of the private searches that preceded it. *See id.* at 117 ("Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now-nonprivate information."). As a final matter, we need not address Berggren's contention that Bolender's authority to possess the memory stick was distinct from his authority to view its contents, as this argument also only becomes relevant if we had concluded that Bolender was acting in an official capacity. *See Walter v. United States*, 447 U.S. 649, 654 (1980) ("[I]t has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents."); *see also Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (unnecessary to decide nondispositive issues).

¶ 21. Because a suppression motion related to the memory stick would have been appropriately denied, Berggren's trial counsel was not ineffective for not making one. *See State v. Simpson*, 185 Wis. 2d 772, 784, 519 N.W.2d 662 (Ct. App. 1994) (an attorney is not ineffective for not making a motion that would have been denied.). Given that counsel's performance in this regard was not deficient, we do not address the prejudice prong. *See Strickland*, 466 U.S. at 697.

2. Alleged ineffective assistance in connection with trial counsel's failure to file a motion to suppress Berggren's custodial statements.

¶ 22. Berggren's second claim on appeal is that his attorney should have sought to suppress his custodial statements. Although he signed a waiver of rights form and acknowledges that he was properly advised of his *Miranda* rights prior to his first interview, Berggren argues that he was not properly advised of his rights in a subsequent interview.[8] In addition, in what appears to be an argument that his statements were coerced, he alleges that his statements were induced by promises of probation and treatment. Lastly, Berggren claims that he invoked his right to counsel on multiple occasions and that his requests were denied.

¶ 23. On review, a trial court's findings of evidentiary or historical fact will not be overturned unless they are clearly erroneous. *See State v. Owens*, 148 Wis. 2d 922, 927, 436 N.W.2d 869 (1989). We independently review the facts as found to determine whether any constitutional principles have been offended. *See State v. Clappes*, 136 Wis. 2d 222, 235, 401 N.W.2d 759 (1987).

---

[8] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

*a. Berggren was properly advised of his Miranda rights.*

¶ 24. Berggren signed a waiver of rights form and acknowledges that he was initially advised of his *Miranda* rights at 7:46 a.m. on November 24, 2005. Notwithstanding, he contends he was not properly advised of his *Miranda* rights during the second segment of the interview. Berggren points to the fact that after approximately fifteen minutes of questioning during the second segment, the detective conducting the interview simply said words to the effect: "You know about your rights, right? You know your rights. You know all that good stuff, right, that I read to you?" At the time of his arrest, Berggren had been employed as a police officer for South Milwaukee.

¶ 25. In addition to showing "that the defendant received and understood his or her *Miranda* warnings," the State has the burden of showing "that the defendant knowingly and intelligently waived the constitutional rights protected by the *Miranda* warnings." *State v. Armstrong*, 223 Wis. 2d 331, 345–46, 588 N.W.2d 606 (1999). "The State also bears the burden on the issue of whether the warnings were sufficient in substance." *Id.* at 346.

¶ 26. The trial court listened to the audio recording of Berggren's in-custody statements, which were made over the course of several interview segments. The pertinent segments for purposes of our analysis on this point are the first and second interview segments because Berggren's argument hinges on whether he properly received his *Miranda* rights during the second segment of the interview.

229

¶ 27. The trial court found that Berggren was properly advised of his *Miranda* rights, understood those rights, signed a waiver of rights form, and agreed to talk to the detective questioning him. The initial period of interrogation began at 7:46 a.m. on the day of Berggren's arrest and ended at 8:23 a.m. The second segment began at 9:45 a.m. that day when Berggren was asked additional questions resulting in further statements by him. The trial court found that during the second segment, the detective explained Berggren's constitutional rights to him and Berggren agreed to continue talking to the detective. The recording was stopped at 10:03 a.m. at Berggren's request and resumed at 10:09 a.m. The second interview segment ended at 10:38 a.m.

¶ 28. Having initially been read his *Miranda* warnings (a fact that is uncontroverted based on the audio recording in the record), contrary to Berggren's contention, the police were not required to repeat the *Miranda* warnings at the outset of each subsequent segment of his interview. *See State v. Cydzik*, 60 Wis. 2d 683, 691, 211 N.W.2d 421 (1973) ("There is no requirement that *Miranda* warnings be repeated once they are given. There is no reason not to repeat them, but no requirement so to do.") (bolding added). This was particularly true in light of the trial court's finding that Berggren, at the time of his arrest, had been employed as a police officer for South Milwaukee for sixteen years and was familiar with his *Miranda* rights. We conclude that Berggren was properly advised of his *Miranda* rights.

*b. Berggren voluntarily gave his statements.*

¶ 29. Berggren also argues that his statements were induced by promises of probation and treatment. This amounts to an argument that his statements were

not voluntarily given. He contends that the detective questioning him conveyed: "the belief that simple possession of child pornography photos would result in a probation disposition"; "the idea that if [Berggren] confessed he would get treatment and help and his confession would have a large impact on the district attorney's position"; "if [Berggren] confessed the confession would have a lot to do with how he was received in the district attorney's office[, however, i]f he persisted in a denial[,] the district attorney would not like to hear that version," and it would affect how the district attorney viewed the case; and finally, if Berggren admitted his guilt, he would get help.

¶ 30. The determination of whether a custodial statement was voluntarily made is one of ultimate constitutional fact which an appellate court determines *de novo. See State v. Santiago*, 206 Wis. 2d 3, 18, 556 N.W.2d 687 (1996). "In determining whether a confession was voluntarily made, the essential inquiry is whether the confession was procured via coercive means or whether it was the product of improper pressures exercised by the police." *Clappes*, 136 Wis. 2d at 235–36. We consider the totality of the circumstances in our determination of whether a confession was voluntary, and in doing so, we "balance the personal characteristics of the defendant against the pressures imposed upon him by police in order to induce him to respond to the questioning." *Id.* at 236. However, if there is no evidence of either physical or psychological coercive tactics by the detectives, the balancing test is unnecessary. *See id.* at 239–40.

¶ 31. "An officer telling a defendant that his cooperation would be to his benefit is not coercive conduct, at

least so long as leniency is not promised." *State v. Deets*, 187 Wis. 2d 630, 636, 523 N.W.2d 180 (Ct. App. 1994); *see also Cydzik*, 60 Wis. 2d at 692. "Similarly, coercive conduct does not occur when . . . an officer, without promising leniency, tells a defendant that if he or she does not cooperate the prosecutor will look upon the case differently." *Deets*, 187 Wis. 2d at 636–37. "In either case, the officer does nothing 'other than predict what the prosecutor will do, without making a promise one way or the other." *Id.* at 637.

¶ 32. Here, the statements Berggren relies on to support his argument do not amount to coercion or improper police practices. We agree with the State that "there is no affirmative evidence in the record of [improper] police practices deliberately used to procure Berggren's confession." *See Clappes*, 136 Wis. 2d at 239. As Berggren should know after sixteen years as a police officer, it is not coercive conduct for an officer to invite a defendant's cooperation by informing the defendant of potential benefits of cooperation or to offer a prediction as to what the prosecutor will do. The statements Berggren references do not constitute promises of leniency. Under the totality of the circumstances, we conclude that Berggren was properly advised of his rights under *Miranda* and he voluntarily gave his statements.

 *c. Berggren did not unequivocally invoke his right to counsel.*

¶ 33. We now address Berggren's claim that he invoked his right to counsel on at least three separate occasions. He contends that he first invoked his right to counsel while he was in the booking room at the Oak Creek police station when he asked to use the telephone to call his parents so that they could obtain an attorney for him. Next, he claims to have requested an attorney

232

while he was being transferred from a holding cell to an interview room, at which time he allegedly told the detective questioning him that he needed to call his parents to get an attorney. Finally, Berggren relies on his statement, "I think I do need an attorney," which was made during one of the interviews while the chief of police for Oak Creek was present in the room with the detective questioning him. The response to Berggren's request was a statement to the effect, "just hear us out," and Berggren proceeded to make additional statements.

¶ 34. As to the request made in the presence of the chief of police, the trial court found that "Berggren, after some discussion about his thinking he needed an attorney, signed the waiver o[f] rights, and agreed to talk further about the incident." This interview segment was stopped while the detective retrieved additional photographs and then resumed, at which time, Berggren unequivocally asked to speak with an attorney, and the interview was immediately terminated. Prior to that, the trial court found that Berggren never told the detective questioning him that he wanted an attorney. The trial court did, however, find that Berggren asked officers other than the detective who interviewed him if he could use the phone and that Berggren told the other officers he wanted to call his parents so that they would let his dog out and call an attorney for him.

¶ 35. The sufficiency of Berggren's invocation of his right to counsel "is a question of constitutional fact that we review under a two-part standard. We uphold the [trial] court's findings of historical or evidentiary fact unless they are clearly erroneous. We review independently the lower court's application of constitutional principles to those evidentiary facts." *See State v. Jen-*

*nings*, 2002 WI 44, ¶ 20, 252 Wis. 2d 228, 647 N.W.2d 142 (citations omitted). If the statement alleged to have invoked counsel is ambiguous or equivocal such that "a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers are not required to cease questioning or clarify the statement. *See id.*, ¶ 36 (internal quotation marks and citation omitted; emphasis in *Jennings*).

¶ 36. We agree with the trial court's conclusion that even if we assume that the defendant made requests to call his parents so that they could call an attorney for him, prior to when he was questioned, his vague statements were insufficient to invoke Berggren's right to counsel. *See State v. Ernst*, 2005 WI 107, ¶ 10, 283 Wis. 2d 300, 699 N.W.2d 92 (noting that even though our review is *de novo,* we benefit from trial court's analysis). The trial court specifically concluded:

> The evidence clearly demonstrates that Todd Berggren wanted to talk to the detective. If he truly did not want to make a statement without an attorney present, he would not have signed the waiver form and agreed to make a statement on multiple occasions. Berggren, as a police officer himself, knew what he had to do to invoke his right to an[] attorney. In fact, he did precisely this at the end of the 5[th] interview segment.

We conclude, as the trial court did, that any statements prior to that time were not unequivocal requests for counsel, particularly when they were immediately followed by Berggren signing another waiver of rights form and agreeing to talk. As such, there would have been no constitutional barrier to the admission of Berggren's statements.

¶ 37. Again, because any suppression motion related to Berggren's custodial statements would have been appropriately denied, Berggren's trial counsel was not ineffective for not making one. *See Simpson*, 185 Wis. 2d at 784. We therefore affirm the trial court's ruling that trial counsel did not render ineffective assistance, and affirm the postconviction order denying Berggren's plea withdrawal motion.

*B. The trial court properly exercised its discretion when it sentenced Berggren.*

¶ 38. As his final argument, Berggren challenges his sentence as unduly harsh and excessive, both as an erroneous exercise of sentencing discretion and as unconstitutional cruel and unusual punishment, violative of the United States and Wisconsin Constitutions.[9] As to the trial court's exercise of its sentencing discretion, Berggren contends that the trial court: failed to explain its reasoning when it sentenced him (in particular, when it failed to explain the reasoning behind its decision to impose consecutive sentences); failed to consider mitigating factors; and placed disproportionate emphasis on the "purported effects" of his actions on the community while neglecting to consider other factors. Berggren points out that the thirty-six years of initial confinement to which he was sentenced makes him eligible for release when he is approximately seventy-six years old, which he describes as a near "death penalty" effect.

_____

[9] The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishment" and is applicable to the states through the Fourteenth Amendment. The state constitution counterpart is article I, section 6 of the Wisconsin Constitution.

¶ 39. Sentencing is left to the discretion of the trial court and appellate review is limited to determining whether there was an erroneous exercise of discretion. *State v. Gallion*, 2004 WI 42, ¶ 17, 270 Wis. 2d 535, 678 N.W.2d 197. When the proper exercise of discretion has been demonstrated at sentencing, this court follows a strong and consistent policy of refraining from interference with the trial court's decision. *State v. Ziegler*, 2006 WI App 49, ¶ 22, 289 Wis. 2d 594, 712 N.W.2d 76. "[W]e afford a strong presumption of reasonability to the [trial] court's sentencing determination because [that] court is best suited to consider the relevant factors and demeanor of the convicted defendant." *Id.*

¶ 40. At sentencing, the three primary factors a court must consider are the gravity of the offense, the character of the defendant, and the need to protect the public. *State v. Harris*, 119 Wis. 2d 612, 623, 350 N.W.2d 633 (1984). In addition to these sentencing factors, the trial court may also consider the following factors:

> "(1) Past record of criminal offenses; (2) history of undesirable behavior pattern; (3) the defendant's personality, character and social traits; (4) result of presentence investigation; (5) vicious or aggravated nature of the crime; (6) degree of the defendant's culpability; (7) defendant's demeanor at trial; (8) defendant's age, educational background and employment record; (9) defendant's remorse, repentance and cooperativeness; (10) defendant's need for close rehabilitative control; (11) the rights of the public; and (12) the length of pretrial detention."

*Id.* at 623–24 (citation omitted). The weight given to each of these factors is also within the trial court's discretion. *Ocanas v. State*, 70 Wis. 2d 179, 185, 233 N.W.2d 457 (1975).

¶ 41. The record reveals that the trial court considered the appropriate factors. In terms of the gravity of the offense, the trial court referenced aggravating factors related to Cynthia's age, the fact that she was an unconscious victim during the assaults, and the degrading nature of Berggren's exploitation of her. The trial court also briefly mentioned the level of planning that went into the crimes. The court further noted that Cynthia's father found out about Berggren's criminal acts while he was serving our country in Iraq.

¶ 42. In addition, the trial court considered Berggren's character, noting the good work Berggren did as a police officer, and the supporting letters submitted on his behalf. The trial court acknowledged Berggren's remorse. However, after relaying these positive aspects of Berggren's character, the trial court referenced "the other side, there's this dark side where you committed these horrific acts." Presumably, this dichotomy led the trial court to remark that Berggren's rehabilitative needs were "somewhat of a question mark" based upon the information it had received "because no one knows the whys or the why nots, so it would take significant treatment to deal with those issues that—that you have."

¶ 43. Finally, the court emphasized the trust relationship that Berggren had with the community, stating: "Your position in the community, that you're —you're there to—to protect and to serve, not to destroy." The court elaborated that based on information it had received, parents of children at Brittany's school struggled with the information related to the charges against Berggren because they had trusted Berggren with their daughters, allowing them to sleep over at his house, take trips with him, and play on soccer teams he coached. The trial court noted that

there was concern as to whether those girls also may have been victims and "counselors had to come into the public schools to be—[to] help with those children. In essence, your conduct generated so many fears in the community that it's going to have a long[-]lasting effect on other individuals."

¶ 44. Immediately prior to sentencing Berggren, the trial court read remarks by the presentence investigator into the record:

> The presentence investigator states that the defendant was a trusted public official in the community for many years compounds his culpability. Clearly, the defendant has long[-]term treatment needs that can be best met in a confined correctional setting versus the community. The writer strongly disagrees with the defendant's contention that he still can be a benefit to the community and should not be sentenced to prison. He must be held accountable for the pain and suffering he has caused the victim and all others directly or indirectly affected by his behavior. The fact that he broke the very laws that he was sworn to uphold substantially—substantiates just cause for him to be punished swiftly and severely. No child should have to be sexually assaulted by their parent figure or anyone else. A lengthy prison sentence is warranted to insure the victim and the community that this defendant will not have access to any more children for a very lengthy period of time.

Although, as Berggren points out, the trial court did not expressly state that it adopted the presentence investigator's reasoning to support the sentence, the clear inference from the above remarks is that the trial court did take this reasoning into account when it sentenced Berggren. *See McCleary v. State*, 49 Wis. 2d 263, 282, 182 N.W.2d 512 (1971) ("It is not only our duty not to interfere with the discretion of the trial judge,

but it is, in addition, our duty to affirm the sentence on appeal if from the facts of record it is sustainable as a proper discretionary act.").

¶ 45. Citing *State v. Hall*, 2002 WI App 108, 255 Wis. 2d 662, 648 N.W.2d 41, to support his argument that the trial court failed to articulate its reasoning in imposing consecutive sentences, Berggren contends that the trial court's sentencing decision, "in large measure, is one in which the reader could simply 'fill in the blank' by inserting any crime at any sentence of any number of years to be served concurrently or consecutively." In *Hall*, we held that the trial court erroneously exercised its discretion by providing inadequate reasons for the consecutive sentences imposed, in contravention of *McCleary*. *See Hall*, 255 Wis. 2d 662, ¶ 5. *Hall* did not, however, establish a new procedural requirement at sentencing that the trial court state separately why it chose a consecutive rather than a concurrent sentence. Rather, *Hall* emphasized the well-settled right of defendants to have the relevant and material factors influencing their sentences explained on the record.

■■■■

¶ 46. A trial court properly exercises its discretion in imposing consecutive or concurrent sentences by considering the same factors as it applies in determining sentence length. *See State v. Hamm*, 146 Wis. 2d 130, 156–57, 430 N.W.2d 584 (Ct. App. 1988); *see also State v. LaTender*, 86 Wis. 2d 410, 432, 273 N.W.2d 260 (1979). The trial court here considered relevant factors and in light of those factors imposed consecutive sentences. Berggren's dissatisfaction with the sentences imposed and their long-term ramifications does not mean that the court erroneously exercised its sentencing discretion.

¶ 47. Finally, Berggren argues that his initial confinement period amounts to cruel and unusual punishment. "The test for whether a sentence violates the Eighth Amendment and whether a sentence [i]s excessive are virtually identical in Wisconsin." *State v. Davis*, 2005 WI App 98, ¶ 21, 281 Wis. 2d 118, 698 N.W.2d 823. A sentence is unduly harsh, excessive and violative of the Eighth Amendment when it is "so excessive and unusual and so disproportionate to the offense committed as to shock public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *See id.* (citation and internal quotation marks omitted). "A sentence well within the limits of the maximum sentence is not so disproportionate to the offense committed as to shock the public sentiment and violate the judgment of reasonable people concerning what is right and proper under the circumstances." *State v. Daniels*, 117 Wis. 2d 9, 22, 343 N.W.2d 411 (Ct. App. 1983).

¶ 48. Berggren's sentence was not shocking, nor does it violate the judgment of reasonable people concerning what is right and proper under the circumstances. As the State points out, the aggregate sentence of fifty-three years is less than one-fourth of the statutory exposure Berggren faced if the maximum sentences for the charges he pled guilty to had all been imposed consecutively. It was within the trial court's discretion to impose an initial confinement period, upon the completion of which Berggren will be seventy-six years old. *See State v. Stenzel*, 2004 WI App 181, ¶¶ 10–20, 276 Wis. 2d 224, 688 N.W.2d 20 (upholding what the defendant described as a "de facto life sentence"); *State v. Ramuta*, 2003 WI App 80, ¶¶ 22–26,

240

261 Wis. 2d 784, 661 N.W.2d 483 (upholding the sentence imposed where the defendant raised an analogous argument).

¶ 49. While Berggren surely hoped that the trial court would weigh the sentencing factors differently, the choice is for the trial court to make. *See Ocanas*, 70 Wis. 2d at 185. We conclude the trial court fully explained Berggren's sentences and the reasons for them. It acted well within its discretion.[10]

*By the Court.*—Judgment and orders affirmed.

---

[10] In his reply brief, Berggren argues, for the first time, that the trial court failed to consider the applicable sentencing guidelines as required by *State v. Grady*, 2007 WI 81, ¶ 30, 302 Wis. 2d 80, 734 N.W.2d 364, *clarified on reconsideration,* 2007 WI 125, 305 Wis. 2d 65, 739 N.W.2d 488. Berggren did not argue that the trial court failed to consider the applicable guidelines in either his postconviction motion seeking sentence modification on the basis that the sentence imposed was the product of an erroneous exercise of discretion or in his opening brief. This court need not address arguments which are raised for the first time in a reply brief or were not made in the trial court. *See Bilda v. County of Milwaukee*, 2006 WI App 57, ¶ 20 n.7, 292 Wis. 2d 212, 713 N.W.2d 661; *Gibson v. Overnite Transp. Co.*, 2003 WI App 210, ¶ 9, 267 Wis. 2d 429, 671 N.W.2d 388. Furthermore, in what amounts to a two-sentence argument by Berggren on this point, he does not develop how the applicable sentencing guidelines would have affected the sentence imposed. We will not develop an argument for him. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (holding that we will not address arguments inadequately briefed).