STATE of Wisconsin, Plaintiff-Respondent,

v.

Adamm D.J. LINTON, Defendant-Appellant.†

Court of Appeals

*Nos. 2009AP2256–CR, 2009AP2257–CR.*
*Submitted on briefs June 1, 2010.—Decided August 31, 2010.*

2010 WI App 129

(Also reported in 791 N.W.2d 222.)

† Petition for Review denied 12/7/10.

687

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J. Adamm D.J. Linton appeals from corrected judgments of conviction entered after a jury found him guilty of first-degree reckless homicide and felony murder, with armed burglary as the underlying offense, both as a party to the crimes, contrary to WIS. STAT. §§ 940.02(1), 940.03, and 939.05 (2007–08).[1] Linton challenges pretrial orders denying his motion to suppress evidence and consolidating the two cases against him for trial. In addition, Linton argues that the trial court erred when it admitted into evidence autopsy photographs of one of the homicide victims. We consolidated Linton's appeals and after reviewing the issues he raises, conclude: (1) the trial court properly held that Linton waived his right to an attorney; (2) joinder was permissible; and (3) the trial court did not err in admitting autopsy photographs of one of the victims into evidence. Accordingly, we affirm.

---

[1] All references to the Wisconsin Statutes are to the 2007–08 version unless otherwise noted.

## I. Background.

¶ 2. On August 22, 2007, on the south side of Milwaukee, two individuals approached Jacob England and attempted to rob him. When England resisted, one of the individuals shot and killed him. Police initially had little information as to who committed this crime.

¶ 3. Six days later, in an apartment on the north side of Milwaukee, Francisco Cuey died as a result of blunt force injuries to his head, suffered during a burglary to an apartment where he was staying, which was located above a business that sold tennis shoes. The record indicates that the burglars broke into the apartment to steal tennis shoes that were being stored there and happened upon Cuey. Through their investigation, police linked three individuals to the Cuey homicide, one of whom was Linton. Another individual believed to have been involved was Anthony Morris. When he was questioned about the Cuey homicide, the criminal complaint relays that Morris connected Linton to the England homicide.

¶ 4. On September 5, 2007, in Milwaukee County case no. 2007CF4314, Linton was charged in the Cuey homicide with felony murder, with armed burglary as the underlying offense, as a party to the crime. Two days later, in Milwaukee County case no. 2007CF4341, Linton was charged in the England homicide with felony murder, while attempting to commit the crime of armed robbery, as a party to the crime. This charge was later amended to first-degree reckless homicide as party to the crime.

¶ 5. Linton filed a motion to suppress statements he made to police, which the trial court denied following a two-day hearing. The State subsequently moved to consolidate the two cases against Linton. The court

granted the motion over Linton's objection and the cases proceeded to trial. The jury convicted Linton of both crimes. For the reckless homicide conviction, the trial court sentenced Linton to forty-five years, broken down into thirty-five years of initial confinement and ten years of extended supervision. For the felony murder conviction, the court sentenced Linton to fifteen years, broken down into ten years of initial confinement and five years of extended supervision, to run consecutive to his sentence for reckless homicide.

¶ 6. Linton now appeals. Additional facts relevant to the issues he raises are provided in the remainder of this opinion.

## II. ANALYSIS.

*A. Request for an attorney.*

¶ 7. Linton asserts that his constitutional rights were violated when he made what he describes as a clear and unambiguous demand for an attorney, which was not honored during his interrogation by police. *See Miranda v. Arizona,* 384 U.S. 436, 478–79 (1966).[2] As a result, he contends that his statements to police should have been suppressed.

¶ 8. The right to counsel is invoked when a suspect expresses a " 'desire to deal with the police only through counsel.' " *State v. Jones,* 192 Wis. 2d 78, 94,

---

[2] The warnings required by *Miranda v. Arizona,* 384 U.S. 436 (1966), are specific: an in-custody defendant must be warned that he or she has the right to remain silent, that anything he or she says may be used against him or her in court, that he or she has the right to an attorney, and that an attorney will be appointed if he or she cannot afford one. *Id.* at 478–79.

532 N.W.2d 79 (1995) (citation omitted). Such a statement must be unambiguous—in other words, the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis v. United States*, 512 U.S. 452, 459 (1994). If the suspect makes an ambiguous or equivocal reference to an attorney, officers need not stop questioning the suspect and may clarify the comment. *Id.*; *see State v. Ward*, 2009 WI 60, ¶ 43, 318 Wis. 2d 301, 767 N.W.2d 236.

▮

¶ 9. We review the sufficiency of Linton's invocation of his right to counsel under a two-pronged standard. *See State v. Jennings*, 2002 WI 44, ¶ 20, 252 Wis. 2d 228, 647 N.W.2d 142. First, we will uphold the trial court's findings of fact unless they are clearly erroneous. *Id.* Second, we independently review the application of constitutional principles to those facts. *Id.*

¶ 10. Linton details the events that transpired after he was apprehended and brought in for questioning as follows:

> Linton was read his *Miranda* rights and was asked if he would like to make a statement. He replied "no." When asked again, he again replied "no." The Detectives stopped the interview, but still seized his shoes.

> About six hours later, [two different detectives] began questioning Linton. After being read the *Miranda* rights, Linton responded: "when I asked for a lawyer earlier, why wasn't he appointed to me." The Detectives responded: "Well if you're asking for a lawyer then we'll just stop talking to you." Linton then agreed to talk to the Detectives.

(Record citations and underlining omitted.) On appeal, Linton does not argue that he made a request for counsel when he was initially questioned. Rather, Linton relies on the statement he made during the subsequent interview, "when I asked for a lawyer earlier, why wasn't he appointed to me," and contends that at that point, "[n]o further questions were allowed . . . ." We are not convinced.

■

¶ 11. In denying Linton's suppression motion, the trial court set forth its reasoning as follows:

> The way I see this matter is that in essence there are two issues, whether or not the defendant first invoked his right to counsel and then secondly whether or not, as I see it, whether or not there was a waiver of that right to counsel. And the reason I indicate a waiver is that I am making reference to tape two at approximately the 24th minute and roughly the 24th second of that tape where the defendant asks the question, or at least puts forth the proposition, ["]when I asked for a lawyer earlier, why wasn't one appointed?["]
>
> Now, that question as I stated to the attorneys has an inference, it makes an inference, it makes an implied statement that the defendant, in fact, asked for a lawyer and that he asked for a lawyer at some earlier time. With respect to the initial interview . . . and I've listened to that, it's a very short tape, I've listened to it a number of times, nowhere on the tape is there a[n] unambiguous, unequivocal request for a right to counsel. There is the request to remain silent and not to make a statement, and the defendant, even when he stated, or at least was called to the stand, indicated that he did not like these female detectives, that in essence they were somewhat disrespectful and aggressive, he didn't like their manner and therefore did not want to speak to them.

. . . .

There is testimony that there was continued contact with the defendant by [the detectives who initially questioned him] after the tape was turned off, but that contact consisted of them in essence seizing the shoes from the defendant.

The parties are correct that this Court must make a determination as to whether or not the defendant asserted his right to counsel, and if that assertion was made, it obviously was made while the tape was off. I find that the testimony of the detective in resolving that question, I find that the testimony of [the detectives] to be more credible, particularly with respect to the fact that they clearly ceased the interview once the defendant asserted his right to silence, and that fact was also substantiated by the testimony that they provided in court.

And so I find that the defendant did not, in fact, ask for a lawyer, that in essence he asked to remain silent or indicated that he did not want to speak to them, and they, in fact, terminated the discussion . . . . And therefore I find having resolved the issue of credibility in favor of the officers as I indicated, I find that the defendant did not ask for a lawyer.

The second tape, however, presents also an unusual fact situation for this Court to resolve, because when the defendant, in fact, asked, ["]when I asked for a lawyer earlier, why wasn't one appointed?["] Now, that statement as I indicated has the inference that he made the previous request for a lawyer. Having ruled that that did not happen, I also have to address in that statement, is he, in fact, asserting his right for a lawyer at that time and whether or not the—in essence the interrogation needs to cease at that point?

I do agree that [the detective who questioned Linton during the second interrogation] in essence does ask clarifying questions of the defendant, which state to

697

the extent that if you are asking for a lawyer, we have to stop talking to you. I think this is a legitimate clarification question with respect to that issue because . . . the question itself is ambiguous in that is the defendant, in fact, asking for a lawyer or he's asking why one wasn't appointed? Those are two different scenarios.

So I think that the—by [the detective] inquiring of the defendant whether or not you are asking for a lawyer, and if you are, we must stop talking to you, there is an additional statement indicated to the defendant because there is a silence at that point and it is the decision, you have to make a decision, and the defendant then indicates, well, I don't mind talking to you, and then he goes on to state that he will talk to them to—up and to a certain limit, and then there is a clarification as what that means, that if, in fact, he wants to stop the conversation, that the detectives will, in fact, stop the conversation.

So I find that on the second tape when the defendant says, ["]when I asked for a lawyer earlier, why wasn't one appointed,["] I find that that is in essence a[n] ambiguous and somewhat equivocal request and that the detective does the right thing and he is clarifying the request and that, in fact, the defendant waives, upon clarification, waives any assertion to the right to a lawyer and agrees to continue with the interrogation at that time.[3]

---

[3] The State writes: "These statements and several others were recorded, introduced as exhibits and played for the jury. The clerk of the Milwaukee County Circuit Court inexplicably did not include the CD exhibits in the record despite WIS. STAT. [RULE 809.15(1)9.]"

The parties are not disputing the contents of the recording —instead, they focus on whether Linton's statement "when I asked for a lawyer earlier, why wasn't he appointed to me" amounts to a clear and unambiguous request for counsel

On appeal, Linton does not assert that the trial court's factual findings were clearly erroneous. As such, we will not disturb them. With respect to the trial court's application of constitutional principles to these facts, we agree that Linton voluntarily waived his right to an attorney when the detective sought clarification in response to Linton's ambiguous request and Linton agreed to proceed with the interrogation.

¶ 12. Finally, we are not persuaded by Linton's contention that we should consider that he "was barely 17 years old and did not have a GED," such that a "reasonable [d]etective would understand that Linton would have a limited ability to communicate that he would like an attorney." Linton testified during the suppression hearing that he had been read his *Miranda* rights on at least three separate occasions prior to (and unrelated to) the questioning in these cases. He testified that he understood those rights and knew that one of the rights afforded to him was the right to an attorney. When he was initially questioned by detectives in the instant cases, Linton was able to convey that he did not wish to make a statement. There is no reason why Linton would not have been able to com-

warranting a cease in questioning. *See Davis v. United States*, 512 U.S. 452, 459 (1994). To make this determination, we do not need to listen to the tape. However, we take this opportunity to remind the State that pursuant to Wis. Stat. Rule 809.15(3), a party may move the court to supplement or correct the record. In addition, Rule 809.15(2) provides that parties are to receive ten-day notice of the provisional contents of the record and are allowed to inspect it prior to its transmittal to the appellate court. Parties need to make sure they are satisfied with the contents of the record because "[w]e are bound by the record as it comes to us." *See Fiumefreddo v. McLean*, 174 Wis. 2d 10, 26, 496 N.W.2d 226 (Ct. App. 1993).

municate to the detectives that he also was asserting his right to an attorney when he was questioned a second time.

## B. Joinder

¶ 13. Next, Linton challenges the trial court's decision to join the two cases against him. He argues that his alleged involvement was the only common connection between the two incidents which occurred six days apart, on different sides of town, involving different weapons, and different co-defendants. According to Linton, the risk of prejudice to him outweighed the public's right to judicial efficiency.

¶ 14. We independently examine the propriety of the initial determination of joinder as a matter of law. *State v. Locke*, 177 Wis. 2d 590, 596, 502 N.W.2d 891 (Ct. App. 1993). "The joinder statute is to be construed broadly in favor of initial joinder." *State v. Hoffman*, 106 Wis. 2d 185, 208, 316 N.W.2d 143 (Ct. App. 1982). Joinder may be obtained when two or more crimes "are of the same or similar character." WIS. STAT. § 971.12(1). "To be of the 'same or similar character' . . . crimes must be the same type of offenses occurring over a relatively short period of time and the evidence as to each must overlap." *State v. Hamm*, 146 Wis. 2d 130, 138, 430 N.W.2d 584 (Ct. App. 1988).

¶ 15. Even where joinder is proper, a defendant may move to sever the counts on the basis of prejudice. WIS. STAT. § 971.12(3). When a defendant moves to sever, "the trial court must determine what, if any, prejudice would result from a trial on the joined of-

700

fenses[, and] weigh [that] potential prejudice against the interests of the public in conducting a trial on the multiple counts." *Locke*, 177 Wis. 2d at 597. In order to establish that the trial court erroneously exercised its discretion, the defendant must establish that he or she suffered " 'substantial prejudice.' " *See id.* (citation omitted). Yet, "[i]f the offenses meet the criteria for joinder, it is presumed that the defendant will suffer no prejudice from a joint trial." *State v. Leach*, 124 Wis. 2d 648, 669, 370 N.W.2d 240 (1985). That is, however, a rebuttable presumption. *Id.*

¶ 16. We first determine whether the initial joinder was appropriate. Linton contends that joinder was improper because there was an insufficient overlap in evidence. He points out that the only overlapping evidence was the testimony of the medical examiner who conducted the Cuey autopsy and who read the notes prepared by the medical examiner who conducted the England autopsy[4] and the "scant" testimony of the detective who took Morris's statement connecting Linton to the England homicide.[5]

¶ 17. In light of the broad construction we afford the joinder statute in favor of joinder, *see Hoffman*, 106 Wis. 2d at 208, we conclude that the aforementioned overlap in testimony is sufficient because both cases involved homicides that ensued after efforts were made to take property from another (England, attempted

---

[4] In this regard, Linton asserts that "the State itself created the overlap of the medical examiner witness."

[5] In Linton's response to the State's motion to consolidate the cases against him, Linton "concede[d] that Mr. Morris could provide admissible testimony at both trials." Morris, however, did not ultimately testify at Linton's trial.

armed robbery; Cuey, armed burglary) within an approximately one-week time frame. As further support for this conclusion, we note that if the cases against Linton had been tried separately, testimony would have been introduced connecting the two homicides because it was only through police investigation of the Cuey homicide that they connected Linton to the England homicide. Thus, we agree with the State's assessment that "the manner in which the England death investigation focused on [Linton], the fact that he was implicated in the Cuey murder was admissible in the England trial to explain to the jury how police identified Linton as England's assailant."

¶ 18. Linton goes on to argue that the trial court erroneously exercised its discretion in joining the offenses against him because the danger of unfair prejudice outweighed the public's right to a joint trial. After hearing argument from both Linton and the State prior to trial, the trial court held:

> At this time, with respect to the joinder of these offenses, it is an issue, an area that the Court is to construe and at least view broadly. We have a circumstance where these two incidents are approximately a week apart. They both involve a similar type of activity, in that, it was an attempt to obtain property. They are homicides . . . they're both charged as felony murders.
>
> I am mindful of the concern that you have, [defense counsel], with respect to a defendant being tried with two felony murder offenses and that [the] jury is instructed they have to make a determination on each offense, and the State has the burden of proof on each offense by evidence that is beyond a reasonable doubt.
>
> Given the similar nature of the charges, given that there are similar and common witnesses to both charges, the Court does find that joinder is permissible and favored in this case.

The trial court further indicated: "If it becomes apparent that there is a reason in which the Court, in essence, needs to sever these cases, then I will deal with that issue if it arises."

¶ 19. Despite the trial court's suggestion, it does not appear that Linton ever moved for severance. *See* Wis. Stat. § 971.12(3) (authorizing severance where the defendant will be "prejudiced by a joinder of crimes"); *see also Tam v. Luk*, 154 Wis. 2d 282, 291 n.5, 453 N.W.2d 158 (Ct. App. 1990) (court of appeals has neither duty nor resources to " 'sift and glean' " the record for facts supporting a party's argument) (citation omitted). At the hearing prior to trial, Linton argued that he would be prejudiced by joining the two cases. The trial court was not satisfied with Linton's showing of alleged prejudice but offered to reconsider the joinder if it ever "bec[ame] apparent that there [wa]s a reason in which the Court . . . need[ed] to sever these cases." Linton did not avail himself of that opportunity during trial.[6]

¶ 20. The offenses met the proper criteria for joinder, and it is accordingly presumed that Linton would suffer no prejudice as a result of the charges

---

[6] It appears an argument could be made that Linton forfeited his argument that the danger of unfair prejudice outweighed the public's right to a joint trial when he failed to move for severance below. *See Gibson v. Overnite Transp. Co.*, 2003 WI App 210, ¶ 9, 267 Wis. 2d 429, 671 N.W.2d 388 ("Generally, we will not consider on appeal arguments not made to the trial court."); *cf. State v. Nelson*, 146 Wis. 2d 442, 457, 432 N.W.2d 115 (Ct. App. 1988) (concluding defendant forfeited argument that "the trial court's joinder ruling opened the door to prejudicial testimony" where although defendant had previously sought severance, he had never sought severance on the particular ground set forth on appeal). However, because the parties both briefed the danger of unfair prejudice resulting from the joinder, we have decided to address it.

being joined for trial. *See Leach*, 124 Wis. 2d at 669. On appeal, however, Linton argues both the nature of the crimes and the evidence at trial substantially prejudiced him. He writes: "A jury is much more likely to think that a person charged with two homicides is guilty of the homicides, thus its decision is based on the quantity of charges." In addition, Linton emphasizes the violent nature of the Cuey homicide and the admission of two graphic photographs showing Cuey's injuries.

¶ 21. As the State points out, "[i]t is not sufficient to show that *some* prejudice was caused." *See Hoffman*, 106 Wis. 2d at 209 (emphasis added). We have previously explained:

> "Any joinder of offenses is apt to involve some element of prejudice to the defendant, since a jury is likely to feel that a (defendant) charged with several crimes must be a bad individual who has done something wrong. However, if the notion of involuntary joinder is to retain any validity, a higher degree of prejudice, or certainty of prejudice, must be shown before relief will be in order."

*Id.* at 209–10 (citation omitted; parenthetical in *Hoffman*). Linton has not shown a "certainty of prejudice" resulting from the joinder of these cases. *See id.* at 210.

¶ 22. With respect to the autopsy photographs showing Cuey's injuries, this is not the type of prejudice that makes joinder improper. *See id.* at 209 (explaining that "some prejudice" is not sufficient). Moreover, there was a cautionary instruction instructing the jury to consider the cases independently, which would have minimized the danger of prejudice. *See id.* at 213 (" 'The danger of prejudice in the trial together of two . . . charges can be overcome by the giving of a proper cautionary instruction.' ") (citation omitted).

704

¶ 23. Linton has failed to establish that he suffered prejudice as a result of the joinder. *See Leach*, 124 Wis. 2d at 669 ("The defendant may rebut the presumption by proving that he would be prejudiced by joinder in a particular case."). As such, we cannot conclude that the trial court erred in joining the cases for trial.

## C. Autopsy photographs

¶ 24. As his last argument, Linton asserts that the trial court erroneously exercised its discretion when it allowed into evidence autopsy photographs of Cuey showing the wounds to his head, which allegedly were caused by the use of bolt cutters. According to Linton, the photographs were unnecessary to prove that the bolt cutters qualify as a dangerous weapon given the other evidence presented during his trial, which included the bolt cutters and a medical examiner's testimony about the cause of Cuey's death.

 

¶ 25. "Whether photographs are to be admitted is a matter within the trial court's discretion. We will not disturb the court's discretionary decision 'unless it is wholly unreasonable or the only purpose of the photographs is to inflame and prejudice the jury.' " *State v. Pfaff*, 2004 WI App 31, ¶ 34, 269 Wis. 2d 786, 676 N.W.2d 562 (citations omitted). The underlying rationale for our deferential review of these matters is as follows:

> "While reasonable persons looking at the photographs as a part of a record may have differing opinions in regard to whether they were cumulative, inflammatory, or prejudicial, the judgment is essentially one to be

exercised by the trial judge. He [or she], better than anyone else, in light of the evidence, can make the determination that the photographs will assist the jury in a rational and dispassionate determination of the facts. Where a trial judge has applied the appropriate discretionary standards, this court will not reverse his [or her] decision unless it appears that, in light of the record as a whole, his [or her] conclusion was wholly unreasonable or if the circumstances indicate that the only purpose of the photographs was to inflame or prejudice the jury."

*Id.*, ¶ 34 n.3 (citation omitted; brackets in *Pfaff*). " 'Photographs should be admitted if they help the jury gain a better understanding of material facts and should be excluded if they are not substantially necessary to show material facts and will tend to create sympathy or indignation or direct the jury's attention to improper considerations.' " *Id.*, ¶ 34 (citation and one set of internal quotation marks omitted).

¶ 26. Under WIS. STAT. § 904.03, the trial court is entrusted to act as the gatekeeper to unduly prejudicial evidence. *See id.* ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). The balancing test of the probative value and danger of unfair prejudice favors admissibility. *See Lievrouw v. Roth*, 157 Wis. 2d 332, 350, 459 N.W.2d 850 (Ct. App. 1990). " 'Unfair prejudice does not mean damage to a party's cause.' " *State v. Mordica*, 168 Wis. 2d 593, 605, 484 N.W.2d 352 (Ct. App. 1992) (citation and one set of internal quotation marks omitted). "Rather, unfair prejudice results where the

proffered evidence ... would have a tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case." *Id.*

¶ 27. During its case-in-chief, the State moved to introduce autopsy pictures of Cuey to show where Cuey was struck, the extent of his injuries, and why he died. Linton's attorney objected based on the prejudicial nature of the photographs, which he argued "would move the jury to react emotionally instead of based on the facts . . . ." The trial court allowed the photographs, reasoning:

> On the charge of felony murder the enhancer question is while armed. The issue then is whether or not it was a dangerous weapon, and a weapon is defined as any device or dangerous weapon. It means any device or instrumentality in the manner it is used was intended to be used or likely to produce death or great, bodily harm.
>
> In this case the allegation is that the bolt cutters, in essence, were used as a dangerous weapon, and, therefore, the State has to establish with respect to whether or not this was a felony murder with the underlying offense being burglary while armed that there was a dangerous weapon.
>
> I'm not sure what the other photos look like, but as I view these two that are going to be introduced, I will indicate that [the photos] although graphic in nature[,] the victim is somewhat cleaned up. It is not as bloody as I'd assumed that the victim was when he initially arrived, and I think given the fact that the State has to prove that this was done with a dangerous weapon there has to be some testimony or evidence at least

707

establishing the injuries or the cause of death. That's why the medical examiner is here.

So, therefore, the Court is going to allow the State to use these exhibits, but I am mindful of the potential prejudice that they may produce and the difficulty that they may have with viewing that, but unfortunately this is a felony murder charge and it is while armed. So the Court is going to allow the State to use these exhibits.

¶ 28. As explained by the trial court, if the jury determined that Linton was guilty of felony murder as a party to the crime, the verdict form directed it to determine, as a penalty enhancer, whether Linton committed the underlying crime of burglary while armed with a dangerous weapon. The statutory definition of a "dangerous weapon" includes any "instrumentality which, in the manner it is used or intended to be used, is calculated or likely to produce death or great bodily harm." WIS. STAT. § 939.22(10). Bolt cutters are not generally considered a dangerous weapon but can be as used here. After reviewing the photographs, we conclude that the trial court properly exercised its discretion in admitting them into evidence. The trial court was sensitive to the nature of the photos, mindful of the potential prejudice and concluded that this was outweighed by their probative value. Under our deferential standard of review, we cannot say that the trial court erroneously exercised its discretion when it allowed the photographs to be presented during Linton's trial. *Cf. Sage v. State*, 87 Wis. 2d 783, 790, 275 N.W.2d 705 (1979).

*By the Court.*—Judgments affirmed.