COURT OF APPEALS
DECISION
DATED AND FILED

June 20, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.      **2021AP842-CR**                          Cir. Ct. No.  **2018CF64**

STATE OF WISCONSIN                          **IN COURT OF APPEALS
DISTRICT III**

STATE OF WISCONSIN,

    PLAINTIFF-RESPONDENT,

V.

PRESTON D. KRAFT,

    DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Rusk County: J. MICHAEL BITNEY, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Preston Kraft appeals from a judgment convicting him, following a jury trial, of first-degree intentional homicide and felony bail

jumping, both as a repeater. Kraft argues on appeal that he is entitled to a new trial because: (1) the ballot question posed to Wisconsin voters to amend the Wisconsin Constitution to enact Marsy's Law was constitutionally deficient; (2) the circuit court erred by refusing to strike an objectively biased juror for cause; (3) his due process rights were violated because the jury could not hear "material" testimony; (4) the court erroneously exercised its discretion by excluding three photographs from evidence; (5) the court erred by not excluding a State witness who was not disclosed to the defense; and (6) the court erroneously instructed the jury on the applicable law of self-defense. We reject all of these claims and affirm Kraft's judgment of conviction.

## BACKGROUND

¶2      Kraft was charged with first-degree intentional homicide and felony bail jumping, both as a repeater. The charges stemmed from allegations that Kraft shot and killed Rodney[1] outside of Rodney's home. Prior to trial, Kraft's competency was challenged and, after a hearing, the circuit court found that Kraft was competent to stand trial. Subsequently, the court granted Kraft's request to proceed pro se and appointed standby counsel.

¶3      Kraft's jury trial took place in June 2020 and, due to the COVID-19 pandemic, everyone in the courtroom was required to wear a mask, and Plexiglas shields were erected in certain areas. Witnesses were instructed to remove their masks while testifying.

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86 (2021-22), we use pseudonyms when referring to the victim and the victim's family members. All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

¶4     During voir dire, Juror 691 stated that he knew one of the law enforcement witnesses, saying, "We're friends.  We hunt and stuff together." After further questioning from the circuit court in which Juror 691 said he did not discuss the case with the witness, the court explained that law enforcement witnesses do not get a "leg up when they come into the courtroom or that they're somehow treated specially simply because they wear a badge."  Juror 691 stated he understood the court's instruction and that he could be impartial and fair. Outside the presence of the prospective jurors, Kraft argued that the court should strike the juror for cause.  The court denied Kraft's motion.  Prior to the parties' peremptory strikes, twenty-eight jurors remained.  Both parties exercised all seven of their peremptory strikes.  Juror 691 was struck and not included in the final fourteen jurors, which included two alternates.

¶5     Before calling its first witness, the State inquired into the circuit court's previous sequestration ruling regarding two witnesses, Ciara (Rodney's adult stepdaughter) and Trinity (Rodney's wife).  Over Kraft's objection, the court clarified that Ciara and Trinity did not have to be sequestered during the trial.

¶6     The State provided nearly three days of testimony and evidence, which included the following.  Ciara and Trinity both testified that they had known Kraft for "years."  According to Ciara, on the day of the incident, Kraft drove a white convertible to the end of their driveway and began threatening her and Rodney.  Ciara stated that Kraft told her he was going to "chop [her] head off."  Ciara testified that Rodney did not have a weapon on him and that she went back inside and that is when she heard gunshots.  Ciara stated that she looked outside and saw Rodney with a gunshot wound to his head.  Ciara and Trinity both testified that their house had security cameras.  Trinity added that she was watching the camera feeds on a monitor when Rodney was shot.  The State sought

to admit, and the circuit court admitted, the security footage into evidence, which was played for the jury.

¶7     The State submitted into evidence an autopsy report performed by Dr. Butch Huston, a forensic pathologist and assistant medical examiner who performed Rodney's autopsy. Huston's report stated that Rodney was pronounced dead at a nearby hospital on the day of the shooting. Huston testified that Rodney died of a gunshot wound to the head.

¶8     A law enforcement officer testified that he arrested Kraft five days after Rodney's death. During Kraft's arrest, the officer located a firearm near where Kraft was lying on the ground. An investigator testified that the white convertible was also discovered. Inside the white convertible, law enforcement located spent shell casings that matched the caliber of the firearm and ammunition found during Kraft's arrest.

¶9     The State also played for the jury a recorded audiovisual interview of Kraft conducted five days after the shooting. In the interview, Kraft explained to law enforcement that: he knew Rodney; he stole the white convertible that law enforcement believed was used in the shooting; there were "three devils" who "fucked up God's plan"; Rodney and Ciara were two of the devils; he had to kill the three devils in order—which included killing Rodney first and Ciara last; he had to kill Ciara by beheading her; and he shot Rodney using the firearm found when he was arrested. Kraft also told law enforcement during the interview that he did not "specifically aim for where [he] hit [Rodney]," that he "just aimed at his position," and that he was not sure if he was trying to hit Rodney with the shots.

¶10     After the close of evidence, the circuit court instructed the jury, as relevant to this appeal, on self-defense and first-degree intentional homicide, as

well as the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide. The jury found Kraft guilty of first-degree intentional homicide and felony bail jumping. The court sentenced Kraft to life imprisonment without the possibility of release to extended supervision, plus a concurrent term of six years' imprisonment for the felony bail jumping conviction. Kraft appeals.

## DISCUSSION

### I. Sequestration and the Marsy's Law amendment

¶11 Kraft first contends that he is entitled to a new trial because the ballot question posed to voters regarding "Marsy's Law"—an amendment to article I, section 9m of the Wisconsin Constitution—was constitutionally deficient. The State contends that Kraft lacks standing to challenge the constitutionality of the ballot question posed to voters because the circuit court decided the sequestration issue on statutory grounds under WIS. STAT. § 906.15(2), not on Wisconsin constitutional grounds. "Under Wisconsin law, the standing of a party whose interest is challenged is determined by: (1) personal interest in the controversy; (2) injury or adverse effect; and (3) judicial policy that 'calls for protecting the interest of the party whose standing has been challenged.'" *Reetz v. Advocate Aurora Health, Inc.*, 2022 WI App 59, ¶7, 405 Wis. 2d 298, 983 N.W.2d 669 (citation omitted). Whether a party has standing to raise a particular argument is a question of law. *Id.* Conversely, the sequestration of witnesses is within the discretion of a circuit court. *State v. Evans*, 2000 WI App 178, ¶7, 238 Wis. 2d 411, 617 N.W.2d 220. Kraft's only response to the State's standing argument is that it is "not clear" which standard the court used to make its sequestration decision.

5

¶12    Based on the circuit court's analysis, it is clear that the court decided the sequestration issue under WIS. STAT. § 906.15(2), not under Marsy's Law, and did so within its discretion.[2]  Consistent with the legal standard in § 906.15(2), the court informed Kraft that the presence of a victim during the testimony of other witnesses may not by itself be a basis for excluding the victim.[3]  Similarly, consistent with § 906.15(2), the court concluded that Kraft made no showing that it was necessary to sequester the two witnesses in order to provide him a fair trial. These two standards are not set forth in article I, section 9m of the Wisconsin Constitution.  Therefore, we conclude that the court did not erroneously exercise its discretion in deciding the sequestration issue on statutory grounds, and we need not address whether Kraft has standing to address the constitutionality of Marsy's Law.

## II. Objectively biased juror

¶13    Kraft next argues that he was denied due process because the circuit court failed to strike Juror 691, whom Kraft claims was objectively biased.

¶14    "'The United States Constitution and Wisconsin's Constitution guarantee an accused an impartial jury.'  'To be impartial, a juror must be indifferent and capable of basing his or her verdict upon the evidence developed at trial.'"  *State v. Lepsch*, 2017 WI 27, ¶21, 374 Wis. 2d 98, 892 N.W.2d 682

---

[2] Even if we were to conclude that the circuit court decided not to exclude the two witnesses on constitutional grounds, our supreme court recently decided that the Marsy's Law ballot question posed to voters did not violate the Wisconsin Constitution. *See Wisconsin Just. Initiative, Inc. v. WEC*, 2023 WI 38, ¶7, 407 Wis. 2d 87, 990 N.W.2d 122.  We could therefore deny Kraft's claim on this ground as well.

[3] Ciara and Trinity are victims as defined by WIS. STAT. § 950.02(4)(a)4.a. (victim includes "[a] family member of [a] person who is deceased" and would have been considered a victim if alive).

(footnote omitted; citations omitted). Objective bias applies when a reasonable person in the individual prospective juror's position could not be impartial. *Id.*, ¶24. Reversal is not required where a circuit court should have removed a biased juror unless the error affected the defendant's "substantial rights." *State v. Lindell*, 2001 WI 108, ¶111, 245 Wis. 2d 689, 629 N.W.2d 233 (applying harmless error analysis under WIS. STAT. § 805.18). Barring certain exceptions not relevant to this appeal, a defendant's substantial rights "are not affected or impaired when a defendant chooses to exercise a single peremptory strike to correct a circuit court error." *See id.*, ¶113; *State v. Sellhausen*, 2012 WI 5, ¶¶17-19, 338 Wis. 2d 286, 809 N.W.2d 14 (discussing exceptions to *Lindell* harmless error rule).

¶15 Kraft concedes that the *Lindell* harmless error rule applies to the facts of this case, and that none of the exceptions to that rule apply. Therefore, assuming without deciding that Juror 691 was objectively biased and that the circuit court erred by not striking the prospective juror, we conclude that any error was harmless because Juror 691 was struck and was not included in the final fourteen jurors.[4] *See Lindell*, 245 Wis. 2d 689, ¶113.

¶16 Kraft's only argument against this conclusion is that Wisconsin courts should return to the rule governing juror bias articulated in *State v. Ramos*, 211 Wis. 2d 12, 564 N.W.2d 328 (1997), which was overturned by *Lindell*. *See Lindell*, 245 Wis. 2d 689, ¶5. Regardless of any possible merit to Kraft's

---

[4] Neither party explicitly states which party preemptively struck Juror 691. Because Kraft raises the issue on appeal, we will assume that he preemptively struck Juror 691. Kraft does not argue that *State v. Lindell*, 2001 WI 108, ¶111, 245 Wis. 2d 689, 629 N.W.2d 233, is inapplicable or that any exception to *Lindell* applies.

argument on this issue, this court may not "overrule, modify or withdraw language from a previous supreme court case." *See Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997). Accordingly, we must follow *Lindell*, which leads us to conclude that any error in not striking Juror 961 for cause was harmless.

## III. Auditory issues

¶17 Kraft next argues that he was denied due process because the jury could not hear two "material" pieces of Dr. Huston's testimony due to the circuit court's COVID-19 precautions. Kraft also cites two other instances where jurors had difficulty hearing testimony, but he concedes that those instances are not reversible on appeal.

¶18 "The right to an impartial jury … and the right to due process[] guaranteed by the Fourteenth Amendment[] both include the right of a criminal defendant not to be tried by a juror who cannot comprehend testimony." *State v. Kettner*, 2011 WI App 142, ¶12, 337 Wis. 2d 461, 805 N.W.2d 132.

¶19 We need not address Kraft's arguments regarding the jurors' inability to hear two aspects of Dr. Huston's testimony because we conclude that Kraft forfeited the issue by not raising it in the circuit court. "[F]orfeiture is the failure to make the timely assertion of a right." *State v. Ndina*, 2009 WI 21, ¶29, 315 Wis. 2d 653, 761 N.W.2d 612. "[S]ome rights are forfeited when they are not claimed at trial; a mere failure to object constitutes a forfeiture of the right on appellate review." *Id.*, ¶30.

> The purpose of the "forfeiture" rule is to enable the circuit court to avoid or correct any error with minimal disruption of the judicial process, eliminating the need for appeal. The forfeiture rule also gives both parties and the circuit court notice of the issue and a fair opportunity to address the objection; encourages attorneys to diligently prepare for and conduct trials; and prevents attorneys from

8

> "sandbagging" opposing counsel by failing to object to an error for strategic reasons and later claiming that the error is grounds for reversal.

*Id.* (footnote omitted).

¶20     Both instances of which Kraft complains occurred during his cross-examination of Dr. Huston.  The first instance occurred when Kraft inquired about possible inconsistencies between Huston's findings and doctors' reports from when Rodney was treated at the hospital:

> [KRAFT]: Throughout the break we did come to realize … that there is [sic] inconsistencies with statements from medical personnel from Mayo Clinic, is this correct?
>
> JUROR:  I was having a hard time hearing.
>
> THE COURT:  The question?
>
> JUROR:  Yes.
>
> THE COURT: Would you read it back?  Thank you for raising your hand.
>
> [KRAFT]: The question is during the break, Mr. Huston, we did come to a conclusion that there are two different reports from two different surgical teams, there's an Eduardo J. Perez, he's an NES neurological surgery [sic], and then there's a Michael D. Erickson, MD, GNS, general surgery.  And during those two—we came to find out that there is [sic] two inconsistencies with reports from medical personnel from Mayo Clinic; is that correct, yes or no?
>
> [HUSTON]:  No.

¶21     The second instance occurred when Kraft was questioning Dr. Huston on Rodney's cause of death:

> [KRAFT]:  So anyway, from my understanding, and if you read through the reports, did [Rodney]—was he pronounced deceased as soon as they stopped the life support?

9

[HUSTON]:  I would assume not.

[KRAFT]:  Is there instances [sic] where there is more than one autopsy performed by different medical examiners?

[HUSTON]:  Yes.

[KRAFT]:  And it should be noted that this wasn't done in this case; is that correct?

….

[KRAFT]: What was the age of [Rodney], do you remember?

[HUSTON]: I don't recall.  I believe he's in his 50's, possibly 53.  It's on the first page of my autopsy report.

[KRAFT]: In your report it says that he is 53 years old, 156 pounds and he's five feet ten inches tall; is that correct?

….

JUROR: Your Honor?  Your Honor?  When the guys are speaking, would they be able to speak more into the microphones?  Because with this stuff on your face and being off the side, we still can't hear.  When he's reading something, ask for that, because we can't hardly hear.

THE COURT: Thank you very much.  I appreciate that. Pull the mics up.

[KRAFT]:  Mine is as far as it goes.

THE COURT:  Okay, then slide in closer, if you can.

….

[KRAFT]:  Doctor Huston, I want you to—

THE COURT:  You'll have to speak louder, Mr. Kraft.

At no point did Kraft raise an objection to the jurors' inability to hear this testimony such that the circuit court could "avoid or correct any error with

10

minimal disruption."[5]  *See Ndina*, 315 Wis. 2d 653, ¶30.  Instead, Kraft decided to continue asking Huston questions.

¶22     Kraft argues on appeal that the issue with jurors being unable to hear trial examinations was not "hidden from" the circuit court and, instead, was an issue "clearly before the court and all the parties had an opportunity to address the error."  Further, Kraft contends he should not be held responsible for failing to raise the issue because he has "no legal training or experience," unlike the judge, the special prosecutor, and standby counsel.

¶23     Regarding Kraft's argument that the issue of a due process violation was raised, we disagree.  As we have previously explained, "the forfeiture rule focuses on whether particular arguments have been preserved, not on whether general issues were raised before the circuit court."  *Townsend v. Massey*, 2011 WI App 160, ¶25, 338 Wis. 2d 114, 808 N.W.2d 155.  Here, Kraft did not raise any argument regarding the auditory issues.  Kraft's argument that the forfeiture rule applies differently to non-lawyers also fails.  "Generally, pro se litigants are bound to the same procedural law as attorneys."  *Id.*, ¶27 n.5.  As in *Townsend*, Kraft fails to explain why this general rule should not apply here.[6]  *See id.* Furthermore, an alleged failure to have proper auditory circumstances for jurors to hear testimony is a quintessential matter that should be raised in the circuit court,

_____

[5] Nor did Kraft raise an objection during the other two instances of auditory issues that he concedes do not constitute reversible error.

[6] In fact, the circuit court advised Kraft of this very principle when conducting a colloquy with him regarding his decision to represent himself.  The court told Kraft that if he proceeded pro se, he would be held to the "same rules of procedure and of substantive law" as a licensed attorney.  Kraft responded that he understood.

so that the court has an opportunity to properly address any claimed violation at the time.

¶24 To the extent the auditory issues were raised, we conclude the circuit court properly addressed them. After the jurors brought the auditory issues to the court's attention, the court asked Kraft to reread a question; instructed Kraft to speak up; and informed Kraft and Dr. Huston to pull the mics closer to their faces. Kraft fails to explain how these results were insufficient.

## IV. Crime-scene photographs

¶25 Kraft next argues that the circuit court erroneously exercised its discretion by excluding three photographs which depicted methamphetamine and drug paraphernalia inside Rodney's home.[7]

¶26 Like other evidence, "[w]hether photographs are to be admitted is a matter within [a circuit] court's discretion." *State v. Linton*, 2010 WI App 129, ¶25, 329 Wis. 2d 687, 791 N.W.2d 222 (citation omitted). "A circuit court erroneously exercises its discretion if it applies an improper legal standard or makes a decision not reasonably supported by the facts of record." *State v. Hunt*, 2014 WI 102, ¶20, 360 Wis. 2d 576, 851 N.W.2d 434 (citation omitted).

¶27 Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more

---

[7] The three excluded photographs are not included in the appellate record. It is an appellant's responsibility to ensure that the record permits an evaluation of his or her assertions of circuit court error on appeal, and "when an appellate record is incomplete in connection with an issue raised by the appellant, we must assume that the missing material supports the [circuit] court's ruling." *State v. McAttee*, 2001 WI App 262, ¶5 n.1, 248 Wis. 2d 865, 637 N.W.2d 774 (citations omitted).

probable or less probable than it would be without the evidence." WIS. STAT. § 904.01. Relevant evidence is generally admissible, WIS. STAT. § 904.02, but "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," WIS. STAT. § 904.03.

¶28    "The term 'substantially' indicates that if the probative value of the evidence is close or equal to its unfair prejudicial effect, the evidence must be admitted." *State v. Payano*, 2009 WI 86, ¶80, 320 Wis. 2d 348, 768 N.W.2d 832 (emphasis omitted; citation omitted).

> Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by improper means or if it appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case.

*Id.*, ¶89 (citation omitted); *see also* *State v. Pfaff*, 2004 WI App 31, ¶34, 269 Wis. 2d 786, 676 N.W.2d 562 ("Photographs should be admitted if they help the jury gain a better understanding of material facts and should be excluded if they are not 'substantially necessary' to show material facts and will tend to create sympathy or indignation or direct the jury's attention to improper considerations." (citation omitted)). "The balancing test of the probative value and danger of unfair prejudice favors admissibility." *Linton*, 329 Wis. 2d 687, ¶26.

¶29    Kraft argued in the circuit court that the pictures were relevant to the homicide because he wanted to use the evidence to discredit two of the State's witnesses who resided at Rodney's residence. On appeal, Kraft contends that the probative value of the photographs was high because the presence of drugs and

paraphernalia contradicted Trinity's testimony that she and Rodney were refraining from methamphetamine use. Further, Kraft argues that "methamphetamine is notorious for causing psychosis in those who use it" and that "methamphetamine psychosis … reinforces Mr. Kraft's belief [that Rodney] was acting aggressively toward him and meant him harm. Aggressiveness is an extremely common side effect of methamphetamine usage."

¶30 In ruling against Kraft's request, the circuit court explained the relevant statutory standards to Kraft and reasoned that the three photographs fell within

> this very category of evidence which may have minimal probative value, if any, that is substantially outweighed by the prejudicial effect that simply because there may have been contraband—suspected contraband or paraphernalia found in the victim's residence, that should somehow be a mitigating factor in the consideration of the jury as to whether or not a homicide occurred in this case.

Citing the court's statement during trial that the jury heard evidence of drug use at Rodney's house, Kraft contends that the court incorrectly characterized the photographs as prejudicial. Kraft further asserts that the court "missed the extensive body of case law which informs courts to err on the side of admission" and then issue cautionary instructions.

¶31 We conclude that the circuit court applied the proper evidentiary standard and made a decision based on that standard that is amply supported by the record. *See* **Hunt**, 360 Wis. 2d 576, ¶20; *see also supra* n.7. The court characterized the three photographs as having "minimal probative value, if any." This finding is reasonably supported by the record. As the court explained, the question for the jury was whether Kraft committed first-degree intentional

homicide (or a lesser-included offense). The photographs, which Kraft sought to admit only to discredit two witnesses, did not make it "more probable or less probable" that Kraft committed one of those offenses.[8] *See* WIS. STAT. § 904.01.

¶32 Similarly, the circuit court characterized the three photographs as unfairly prejudicial. This finding is reasonably supported by the record. The court reasoned that drug use in Rodney's house was not "a mitigating factor in the consideration of the jury as to whether or not a homicide occurred in this case." In other words, the photographs could have caused the jury to base its decision on "something other than the established propositions in the case." *See Payano*, 320 Wis. 2d 348, ¶89 (citation omitted).

¶33 Kraft's reliance on the circuit court's statements regarding the jury's knowledge of drug use at Rodney's residence is misplaced. The statements made by the court and cited by Kraft were from the previous day's testimony during Kraft's cross-examination of Trinity. Outside the presence of the jury, standby counsel argued to the court that Kraft should be able to cross-examine Trinity on Rodney's character because the State asked Trinity to describe Rodney—i.e., was he reliable, was he nice, and the like. In response, the court explained that the jury had heard evidence of drug use, but it clarified: "I trust the jury is going to understand this case is not a case about drugs, it's about a homicide. It's about whether Mr. Kraft killed [Rodney] or not, whether that was an intentional act or not." The court further explained:

---

[8] At trial, Kraft did not seek to admit the photographs to demonstrate that Rodney was acting "aggressively" toward him, and we need not address that argument further. *See Townsend v. Massey*, 2011 WI App 160, ¶¶25, 27, 338 Wis. 2d 114, 808 N.W.2d 155.

> So we've already opened the door and talked about the fact that these people may have recreationally used drugs, to a certain extent. I don't think that's going to get a lot of traction with the jury, but I'm not the jury. So to the extent that that door has been open[ed], I think there's been testimony about it. If [Kraft] wants to ask some more questions about it, he can certainly do that, subject to [the State's] objections if he thinks it's crossed the line or gone beyond what he's opened or provided on direct examination ….

¶34 In context, the circuit court was not allowing the parties an unfettered ability to introduce evidence regarding drug use at Rodney's home. Nor was the court assessing the probative value or potential prejudicial effect of that evidence. Instead, the court was allowing Kraft to respond to a specific topic the State introduced in the context of the State's witness, Trinity.

¶35 Furthermore, Kraft's statement that circuit courts should "err on the side of admission" and then issue cautionary instructions is undeveloped.[9] As explained, the admission or exclusion of evidence is left to a circuit court's discretion. *Linton*, 329 Wis. 2d 687, ¶25. While circuit courts "may provide limiting instructions, give a cautionary instruction, edit the evidence, or restrict a party's arguments," courts are not required to do so. *See State v. Marinez*, 2011 WI 12, ¶41, 331 Wis. 2d 568, 797 N.W.2d 399 (citation omitted). Similarly, circuit courts are not required to admit all evidence simply because the balancing

---

[9] Kraft argues that the State "waived" any argument regarding the merit of the cautionary instruction issue because it did not respond to his argument in its respondent's brief. We assume that Kraft is arguing that the State conceded the issue. *See State ex rel. Blackdeer v. Township of Levis*, 176 Wis. 2d 252, 260, 500 N.W.2d 339 (Ct. App. 1993) (failure to file a respondent's brief "tacitly concedes" that the circuit court erred). We disagree. The State's brief adequately challenged Kraft's arguments on the issue of the photographs' admissibility under WIS. STAT. §§ 904.01 and 904.03. The State had little to respond to with respect to Kraft's cautionary instruction argument because, as we have explained, circuit courts are not required to admit prejudicial evidence with minimal probative value and issue a cautionary instruction, and Kraft offers no authority to the contrary in either of his appellate briefs.

test for the admissibility of evidence, as a general matter, favors admissibility. The question before us is whether the circuit court erroneously exercised its discretion by excluding the specific photographs at issue. As we have explained, the court applied the correct legal standard and made a decision reasonably supported by the facts of record.

## V. Failure to exclude undisclosed witness

¶36 Kraft next argues that the State's adding of a witness four days before the start of Kraft's trial without disclosure to him violated WIS. STAT. § 971.23(1)(d), and the circuit court was therefore required to exclude the witness under § 971.23(7m). "When evidence that should have been excluded under § 971.23 is not excluded," the defendant receives a new trial only if "the improper admission of the evidence [was] prejudicial." *State v. DeLao*, 2002 WI 49, ¶60, 252 Wis. 2d 289, 643 N.W.2d 480.

¶37 The State filed a supplemental witness list on June 4, 2020, four days before the start of Kraft's trial, which included one added witness—Detective Jeff Nocchi. Kraft argued that the State failed to provide him a copy of the supplemental witness list. During the trial, the State argued that Nocchi was a foundational witness whose "sole purpose" was to authenticate the home's security footage because Nocchi actually downloaded the security footage. The circuit court denied Kraft's motion to exclude Nocchi from testifying, finding that Kraft was provided with Nocchi's report through discovery. The court added: "Frankly, I think that this footage can be verified, as well, through [Trinity] if necessary."

¶38 Assuming without deciding that the State violated WIS. STAT. § 971.23(1)(d) by adding Nocchi to its witness list four days before trial and not

17

providing Kraft with a copy of the supplemental witness list, and assuming that the circuit court erred by not excluding Nocchi under § 971.23(7m), we conclude any such error was harmless. *See DeLao*, 252 Wis. 2d 289, ¶15 (explaining three-step test used to analyze discovery violations, the last of which is a harmless error analysis). "A violation is harmless when there is no 'reasonable possibility' that the violation contributed to the conviction." *State v. Rice*, 2008 WI App 10, ¶19, 307 Wis. 2d 335, 743 N.W.2d 517 (2007) (citation omitted); *see also* WIS. STAT. § 805.18. Put differently, we ask whether "it is 'clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error.'" *State v. Harvey*, 2002 WI 93, ¶49, 254 Wis. 2d 442, 647 N.W.2d 189 (citation omitted). The State has the burden of establishing that an error is harmless. *See State v. Thomas*, 2023 WI 9, ¶11, 405 Wis. 2d 654, 985 N.W.2d 87. We independently review whether the admission of evidence was harmless. *Rice*, 307 Wis. 2d 335, ¶14.

¶39     Kraft argues on appeal that the circuit court's purported error in allowing Nocchi to testify was not harmless because the security footage was a "substantial piece of evidence." We agree with the State, however, that the security footage was admissible through other means. As the court noted, Ciara and Trinity both testified that their home had security cameras on the day of the shooting, and Trinity added that she was watching the security footage at the time Rodney was shot. She testified that "it looked like [Rodney] had turned to see what was going on at the road and he just fell over." The State could therefore have called Trinity to testify again and inquire whether the security footage that the State sought to admit was the same security footage she watched the day of the incident. *See* WIS. STAT. § 909.01 (authentication requirements).

18

¶40    Regardless, there was more than enough evidence in the record for us to conclude, beyond a reasonable doubt, that Kraft would have been convicted of first-degree intentional homicide and felony bail jumping even if the State had not been able to introduce the security footage. Kraft contends that the only other witness who observed the incident was Ciara and that she is unreliable because of her criminal history and her family's history with Kraft. Even if Ciara's testimony was so unreliable because of her criminal history, Kraft fails to address Trinity's testimony about what she observed.

¶41    Glaringly, Kraft also ignores the remaining evidence against him. In addition to the eyewitness testimony from Ciara and Trinity, the State played the recorded audiovisual interview in which Kraft admitted to stealing the white convertible that law enforcement believed was used in the shooting and, most importantly, admitted to shooting Rodney. The State also presented evidence that Kraft was arrested five days later while in possession of a firearm that matched the one used in the shooting. The ammunition in the firearm's magazine and chamber matched the type of ammunition found in the white convertible.

¶42    The State has therefore met its burden to demonstrate, beyond a reasonable doubt, that there is no possibility that any circuit court error in permitting Nocchi to testify contributed to Kraft's convictions. The security footage would have been admitted through Trinity, and the jury would have therefore seen the security footage regardless. Even if the jury had not seen the security footage, the evidence was more than sufficient for the jury to find beyond a reasonable doubt that Kraft was guilty of first-degree intentional homicide and felony bail jumping.

## VI. Self-defense jury instruction

¶43    Lastly, Kraft argues he is entitled to a new trial because the circuit court erroneously instructed the jury on the applicable law regarding self-defense. Specifically, he claims the court erred because, when instructing the jury on self-defense, it failed to instruct the jury on the definition of "reasonably believes." Kraft asserts that this error is sufficient to reverse his conviction because whether his beliefs in this case were reasonable was a "central question" of his trial. "A circuit court … has broad discretion in instructing a jury" and properly "exercises its discretion in administering a jury instruction so long as the instructions as a whole correctly stat[e] the law and compor[t] with the facts of the case." *State v. Langlois*, 2018 WI 73, ¶34, 382 Wis. 2d 414, 913 N.W.2d 812 (alterations in original; citations omitted). "An erroneous jury instruction warrants reversal only when the error is prejudicial." *Id.*, ¶48; *see also supra* ¶38 (harmless error standard of review).

¶44    During the jury instruction conference, the circuit court ruled that it would include the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide. The court subsequently instructed the jury: "If you are not satisfied that the defendant is guilty of first[-]degree intentional homicide, you must consider whether or not the defendant is guilty of second[-]degree intentional homicide or first[-]degree reckless homicide which are less serious degrees of criminal homicide." The court also instructed the jury on self-defense: "[A] person is privileged to intentionally use force against another for the purpose of preventing or terminating what he *reasonably believes* to be an unlawful interference with his person by the other person. However, he may intentionally use only such force as he reasonably believes is necessary to prevent or terminate the interference." (Emphasis added.) As Kraft points out on appeal,

20

WIS. STAT. § 939.22(32) defines "reasonably believes" as meaning "that the actor believes that a certain fact situation exists and such belief under the circumstances is reasonable even though erroneous." The court did not instruct the jury on this definition.

¶45 The circuit court also informed the jury that in order to find Kraft guilty of first-degree intentional homicide, it would need to find beyond a reasonable doubt that Kraft either "did not actually believe he was in imminent danger of death or great bodily harm," or "did not actually believe the force used was necessary to prevent imminent danger of death or great bodily harm to himself." Importantly, the court informed the jury:

> When first[-]degree intentional homicide is considered, *the reasonableness of the defendant's belief is not an issue.* You are to be concerned only with what the defendant actually believed. *Whether these beliefs are reasonable is important only if you later consider whether the defendant is guilty of second-degree intentional homicide.*

(Emphasis added.)

¶46 Even if the circuit court erroneously informed the jury by not including the definition of "reasonably believes," the error was harmless because the jury found Kraft guilty of first-degree intentional homicide and thus did not find that Kraft had *any* actual belief regarding self-defense. In other words, the jury found as a matter of fact that Kraft did not have any belief—whether reasonable or unreasonable—that his actions were "necessary to prevent imminent death or great bodily harm to himself" and that the force used was "necessary to prevent or terminate the interference." *See* WIS. STAT. § 939.48. Therefore, the State has met its burden of showing, beyond a reasonable doubt, that Kraft would

21

still have been found guilty of first-degree intentional homicide even if the court had included in the jury instruction the definition of "reasonably believes."

¶47 Kraft argues that the purported error with the jury instruction is not harmless because we cannot analyze the jury's deliberations. While it is true that we cannot inquire into the jurors' minds or their reasoning, we do know that if the jury believed that Kraft had *any* belief (reasonable or not) that self-defense was required, the jury would have—based on the circuit court's instructions—found Kraft either not guilty based on self-defense of any homicide, or guilty of one of the two lesser-included charges. *See State v. LaCount*, 2008 WI 59, ¶23, 310 Wis. 2d 85, 750 N.W.2d 780 (we presume jurors follow jury instructions). This circumstance is true as a matter of law. Based upon the instructions given, evidently the jury did not believe that Kraft had any actual belief regarding the self-defense standards, and therefore the jury found him guilty of first-degree intentional homicide.

¶48 Kraft also argues that the purported error was not harmless based on *Werner v. State*, 66 Wis. 2d 736, 226 N.W.2d 402 (1975). According to Kraft, but without citation to any particular passage, *Werner* held that "a circuit court's use of the incorrect alternative wording required the jury [to] find the intent to kill prior to analyzing the privilege of self-defense event though the jury was previously properly instructed on the privilege." Kraft cites *Werner* for the proposition that "[w]hen an instruction goes to the heart of the defendant's claim of self-defense and alters the legal standards, the error is harmful."

¶49 *Werner* is inapposite to this case. In *Werner*, the defendant was charged with "second-degree murder," which did not include an intent element. *Id.* at 748-50. Our supreme court held that an undisputed error with a jury

22

instruction was prejudicial where the circuit court instructed the jury that it must first find the defendant intentionally killed someone prior to finding the act was in self-defense. *Id.* Unlike *Werner*, there is no allegation in this case that the circuit court's jury instructions altered the legal standards for the charges or for self-defense.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.